UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
CRISTINA MELENDEZ, and her infant daughters,
YA and YS,

                      Plaintiffs,

            -against-                      COMPLAINT

ETHICAL CULTURE FIELDSTON SCHOOL,       (Jury Trial Demanded)
JESSICA BAGBY, KENNY GRAVES,
STEPHANIE WEBER, JOE ALGRANT, and
JOHN AND JANE DOES,

                    Defendants.

-------------------------------------------------------------x

      Plaintiffs, Cristina Melendez, and her infant daughters, YA and YS, by their

undersigned attorneys, hereby allege as and for their Complaint as follows:

## PARTIES

      1.    Plaintiff Cristina Melendez ("Melendez") is a person of color and the

mother with legal custody of her two infant daughters, YA and YS, who are also

Plaintiffs in this action.

      2.    Plaintiff YA is a person of color, a former student at Defendant Ethical

Culture Fieldston School, and sixteen years old.

      3.    Plaintiff YS is a person of color, a former student at Defendant Ethical

Culture Fieldston School, and is ten years old.

      4.    Defendant Ethical Culture Fieldston School ("ECFS") is and was at all

relevant times an exclusive, expensive, and predominately white private school located at 3901 Fieldston Road, Bronx, New York 10471.

5.     Defendant Jessica Bagby was at times relevant to this Complaint the Head of School at ECFS.

6.     Defendant Joe Algrant was at other times relevant to this Complaint also the Head of the School.

7.     Defendant Kenny Graves was at times relevant to this Complaint an Assistant Principal at ECFS's High School.

8.     Defendant Stephanie Weber was at times relevant to this Complaint a ninth-grade math teacher at ECFS's High School.

9.     Defendants John and Jane Does are individual employees or agents of ECFS whose identities are at this time unknown and will be added as Defendants at a later date.

JURISDICTION AND VENUE

10.     This action arises from 42 U.S.C. § 1981 as well as New York State and New York City laws, all of which prohibit racial discrimination and retaliation on the basis of race and color.

11.     Venue is proper in this District because the events relevant to this Complaint and the claims arose in this District.

STATEMENT OF FACTS

*Introduction*

12.    YA and YS are academically gifted students who sought an educational environment that would enable them to achieve their full potential in school.

13.    YA and YS, with the close support of their mother, Cristina Melendez, successfully competed for acceptance at ECFS, and received scholarships from ECFS as lower-income minority students.

14.    YA attended ECFS as a student for about ten years; she joined the school as a kindergartener in September of 2012 and left in April of 2022, just prior to the end of her ninth-grade year.

15.    YA withdrew from ECFS before the end of the semester as a result of her being falsely accused of cheating by a math teacher, Defendant Stephanie Weber. This false accusation was made the day after YA's mother, Melendez, complained to school administrators of the continuing racially hostile treatment of YA by the math teacher.

16.    YS joined the school as a pre-kindergartener in September 2017, and was an ECFS student until the school forced her to leave in September 2022. ECFS refused to enroll YA in its fourth-grade class after YS's mother, Melendez, and her sister, YA, complained to school administrators about the racist affronts by white ECFS students and the indifferent attitude about overt racial hostility at the school

by ECFS teachers and administrators.

17.     The Plaintiffs in this action are not the only persons of color who were confronted with racism and retaliation at ECFS. Despite its façade of inclusion, the school has a record of systemic indifference to racial bullying and a record, practice and policy of retaliating against those who complain about it. As set forth in more detail below, the ECFS culture of racial bullying has emboldened students to commit blatant acts of racism against persons of color. Those who commit racist affronts do so with impunity, and those who object are subjected to retaliation by the school.

18.     The school's culture of unchecked racial hostility and the resulting trauma to students and families of color at ECFS provoked a mass protest in March 2019 when over 50 students in the High School occupied one of the main school buildings to demonstrate against and expose the school's utter indifference to racism on the campus.  YA was in the sixth grade and YS was in kindergarten when the school building was taken over by students.

19.     For three days and three nights in March 2019, numerous students of color as well as many supportive white students at ECFS, occupied the school building and published several specific demands for the school to address racial hostility at the school.

20.     During the course of the sit-in, the Head of the School, Defendant Bagby, *admitted* that the school was responsible for the racially toxic environment at

ECFS.  Bagby stated in a widely-distributed email message to students, faculty and

parents that:

> "The current situation arises out of *multi-year racial trauma* our students
> have experienced while *at our school*. My colleagues and I could not be
> more profoundly sorry for this reality, which we fully recognize has
> weighed on the minds, hearts, and spirits of our students of color and their
> families *for years*." (emphasis added).

*The Mutation of Ethical Culture Fieldston School*

21.     ECFS did not start out as an organization that condoned racial hostility

by its students and staff.

22.     ECFS was founded in the late 19th century by Felix Alder as a free

school serving the poor children of the City of New York. ECFS, however,

abandoned its founding principles to become an elite, exclusive, and expensive

private school that puts its students on track to be admitted to selective colleges and

universities in the United States, particularly Ivy League and other top schools in the

country.

23.     ECFS recruited talented students of color, such as YA and YS, to

maintain the appearance of diversity and equality. The school exploited students of

color to showcase its ethical roots as a liberal, inclusive, and racially diverse school.

But in practice, ECFS is an elitist and racially biased school controlled by a board of

directors and wealthy, entitled, predominantly white individuals who purposefully

and intentionally discriminate against persons of color; maintain negative

stereotypical attitudes about students of color; and demand a free pass for white students who violate the school's Code of Conduct regarding racially offensive conduct directed at persons of color.

24.    Given the racially toxic environment at the school, some ECFS officials attempted in good faith to address the matter of racism.  For example, many years ago, the Principal of the Lower School, George Burns, created a "Conversation About Race" program where fourth and fifth graders under his supervision were placed in discussion groups for the purpose of discussing and learning about race, racism, and its effect on all people and cultures.

25.    Burns also made it clear to students, parents, educators, and other staff at the school that offensive racial comments would not be tolerated. On one occasion when a fifth grader used the n-word toward a student of color, Burns required the fifth grader to read an apology to the student in front of the entire fifth-grade class.

26.    Although Burns' "Conversation About Race" program gained national acclaim, many of ECFS's white parents and educators objected, expressing resentment that "persons of color complain too much," that their concerns were "overblown," and that "white lives matter too."

27.    During the course of the 2016-2017 academic year, the school hired Defendant Bagby as the Head of School, and one of Bagby's first acts in 2016 was to admonish Burns for his "Conversation About Race" program. She also explained

to Burns that several white parents (who she described as "Zionists" and "Jews") found his program discussing racism objectionable.

28.     Burns rejected Bagby's pandering to the sophistic concerns of privileged white families and filed a formal complaint against Bagby with ECFS's human resources department regarding Bagby's racially-charged comments about "Zionist" and "Jews."

29.     ECFS did not address Bagby's misconduct; instead, it investigated *Burns*. ECFS's "investigation" found that he was insensitive to female staff, and forced him to resign in June 2017.

*Unchecked Racism Persists Under the Bagby Administration*

30.     YA was in fifth grade at ECFS and YS started pre-kindergarten in September 2017. This was the year that Bagby became Head of School and ECFS abandoned any semblance of its purported mission to provide an equal and inclusive educational environment for students of color.

31.     Under Bagby's leadership, ECFS broke its promise to Melendez, YA and YS and other students and families of color by denying them the same opportunities and benefits that were provided to white students.  Instead of a welcoming and academically robust environment, ECFS became a forum for severe and pervasive racial animus that took a toll on YA and YS's self-esteem, academic confidence, and physical and mental health. The racial discrimination against them

was compounded by systematic retaliation against anyone who had the temerity to complain about racism and unequal treatment.

32.     For example, during the time of their enrollment at ECFS, Melendez, YA, and YS and other students of color witnessed, or became aware of numerous racist incidents, where white students used the n-word when addressing or referring to black or brown students at the school or otherwise acted in a racially hostile manner toward students of color at the school.

33.     Although the use of a racial slur or a racially derogatory statement violated the school's Code of Conduct, ECFS did nothing whatsoever to address the ongoing abuse of students of color, and it became common knowledge that racially offensive conduct by white students or faculty would be ignored or excused.

34.     Upon information and belief, the school had at the time and continues to have a practice and *de facto* policy of not disciplining white students for racist conduct. Racist conduct was neither addressed nor punished.

35.     Upon information and belief, the disciplining of a white high school student for making a racist comment or otherwise acting in a racially discriminatory manner toward a student of color should lead to a form of school-initiated disciplinary action that would in the ordinary course, if substantiated, be reported as part of an application to any college or other school for which the student later sought admittance.

36.     Rather than disciplining students for racist acts, ECFS purposefully and knowingly refused to take proper action; as a result, ECFS willfully created a racially hostile environment at the school that persisted throughout the time that YA and YS attended ECFS.

37.     ECFS also purposefully, knowingly, and intentionally refused to conduct proper investigations into racism at the school.  For example, in 2016, as a "senior prank" a group of white students brought into the school several dozen large watermelons and littered the entire office of a black mid-level administrator at the school with the watermelons.

38.     Although the black administrator was shocked and deeply hurt by this blatantly racist affront and although word of the offense became widely known throughout the school, ECFS intentionally and knowingly refused to conduct any kind of investigation because it did not want to identify or discipline the white students for their racist stunt.

39.     The use of social media provided another means whereby blatant racism was condoned by ECFS.  During the spring semester of 2018, YA, YS, Melendez, and the entire school community were exposed to a widely disseminated video of two white seniors singing a song in which they repeatedly used the n-word.

40.     As with the other examples of racism, ECFS refused to take disciplinary action against the two students, failed to charge them with violations of

the Code of Conduct, and permitted them to graduate from the school later that same

semester without having any notation in their school records that these two students

had violated the Code of Conduct by publishing racially offensive statements.

41.     During that same period in spring 2018, an ECFS student of color and

his parents brought a lawsuit against the school and Bagby charging racial

discrimination and retaliation. *See M.H.B., et al. v. Ethical Culture Fieldston School,

et al.,* Bronx Supreme Index No. 23518/2018E at ECF Doc. # 1.

42.      The *M.H.B.* suit accused Bagby and ECFS of retaliation for falsely

reporting the student's parents to New York City's Child Protective Services for

parental neglect of their child.

43.     Word of the lawsuit quickly circulated throughout the ECFS

community.

44.     In response to the widespread knowledge of the lawsuit, Bagby publicly

attacked the student and his parents in an email to the entire ECFS community,

accusing the *M.H.B.* plaintiffs of filing a "baseless lawsuit" and "profiteering" at the

expense of student safety by challenging the school's decision to contact Child

Protective Services.  *Id.* at ECF Doc. # 2 ¶ 77 (Amended Complaint).

45.      Bagby's school-wide email was intended to humiliate anyone speaking

out about racial bias and to suppress any effort by students of color or their parents

to assert their rights to be free from racism or retaliation at the school.

46.     As a result of Bagby's public attack vilifying the *M.H.B.* plaintiffs, Melendez, YA, and YS learned that the school leadership would harshly retaliate against students and parents who spoke out against racism at the school.

47.      At the same time, it was clear to students of color and their parents that ECFS was an open forum for virulent racism by a privileged and protected class of white students.

48.     In discussions with other students of color, YA and YS learned of several specific instances of racism against students of color tolerated at the school. For example, they learned that white students at the school repeatedly taunted a female Black student about her hair without consequence; that a white student in the middle school berated a Black student with the n-word and whipped the Black student with a sweater; and that white students regularly used racial slurs at school and that no corrective action was taken by the school.

49.     The racially charged school atmosphere that YA, YS, and Melendez endured included voiced assumptions that students of color were unfairly receiving scholarships; that by not paying the full or fair cost of tuition they were not entitled to receive the same level of support services from the school; that students of color were poor; that students of color were admitted to the school based merely on their color and that they lacked the academic abilities of white students; and above all, that students of color at ECFS were not entitled to or deserving of equal or fair

treatment at the school or by the school.

50.     As an institution and by means of the practices and policies set forth in this Complaint, ECFS purposefully and intentionally discriminated against persons of color, including YA, YS, and Melendez, and purposefully and intentionally retaliated against persons of color, including YA, YS, and Melendez, who complained about racism at the school.

51.     As an institution and by means of its practices and policies, ECFS is intentionally and deliberately indifferent to the racially toxic environment that exists and persists at the school.

*The Direct Impact of the School's Racism on the Plaintiffs*

52.     Melendez raised concerns to ECFS staff for several years about systemic racism she witnessed at the school; throughout, she urged the school to acknowledge, address and rectify acts of racial hostility.

53.      During the 2021-2022 academic term, the school's persistent indifference of racism and continuing acts of retaliation created the circumstances that led to the events impacting the Plaintiffs upon which this action is based.

54.     In October 2021, yet another incident of racism occurred in YA's ninth-grade class when a male white student used the n-word as a racial slur. The school acknowledged the blatantly racist incident but refused to take disciplinary action against the perpetrator.

55.     When Melendez learned of the incident, she informed the head of the ninth-grade class, Nikki Buccello, that the school needed to take direct action to address racism at the school. Melendez also informed Nikki Buccello that many of the students in the ninth-grade class, who were at the school during the three-day protest two years earlier, doubted the school's claims that it was working toward racial justice. Melendez further expressed her view that minimal and/or secret disciplinary action by ECFS was not the proper means to address racism.

56.     ECFS failed to take steps to address the incident and Melendez's expressed concerns were simply ignored.

57.     Three months later, in January 2022, YA reported to an ECFS school doctor, Dr. Meghan Oppenheimer, that Ms. Palma Repole, a science teacher at the high school, was treating YA treated unfairly and harshly on account of YA's race.

58.     At the same time, Melendez complained directly to an Assistant Principal at the High School, Defendant Kenny Graves, that Ms. Repole was treating YA unfairly and harshly on account of YA's race.

59.     The school's claim that it takes complaints of racism seriously is a perversion; in actuality, ECFS instituted a policy to rebuff and suppress such complaints. ECFS has an established practice of concocting a "defensible position" regardless of the facts and then attacking, punishing, and discrediting the complainer.

60.     ECFS, true to their defensible position strategy, refused to conduct any

investigation of Melendez's complaints about Ms. Repole and refused to take any action against the teacher. Instead, ECFS belittled Melendez's concerns as another example of an undeserving minority student complaining because the student was not capable of doing the schoolwork.

61.     Three months later, in early April 2022, Melendez raised with the school a complaint about how a High School math teacher, Defendant Stephanie Weber, was treating YA unfairly and harshly on account of YA's race.  Melendez cited examples where Weber's practice was to allow white students to take home exams while students of color had to take the exams in class. Melendez also pointed out that Weber frequently ridiculed YA in front of the class but never ridiculed or criticized similarly situated white students publicly.

62.     On April 3, 2022, Melendez sent to Assistant Principal, Defendant Graves, Interim Upper School Principal Tony Marro, Assistant Principal Rashad Randolph, and the Dean of the ninth-grade class, Jessica Romano, an email objecting to Weber's racially motivated mistreatment of YA.

63.     In a clear act of retaliatory retribution, Weber responded the *following* day, April 4, 2022, with a false and malicious accusation that YA cheated on an in-class assignment.

64.     Weber's claim that YA was cheating was clearly pretextual.  On April 4th, Weber returned to her math students a recent test, and while still in class, YA

and the other students worked on the errors they made on the test.  After reviewing

YA's in-class corrections, Weber fabricated a baseless and nonsensical claim that

YA cheated because YA provided correct answers to the test after YA saw her

mistakes. Since YA could see her mistakes on the test and since YA was permitted

to make corrections by referring to her notes, it is obvious that Weber simply

manufactured a bogus claim of "cheating" on an in-class test-correction exercise to

punish YA because Melendez made the April 3rd complaint against Weber.

65.     YA had an unblemished record at ECFS for the past decade and had

never before been accused of cheating. She was devastated by Weber's false and

pretextual attack on her academic and personal integrity.

66.     Melendez, on learning that afternoon that Weber accused YA of

cheating, sent the school another email pointing out that the fabricated allegation of

cheating was a pretext and blatant retaliation for her and YA's complaints about

Weber's racially disparate classroom conduct. Melendez demanded that the school

protect YA from further retaliation by Weber.

67.     Melendez informed the school that YA, who was only 15 at the time,

did not feel safe at the school after the false and humiliating accusation by Weber.

Melendez sought assurances from the school that it would be a safe environment for

YA before she could return to school.

68.     ECFS refused to provide assurances of safety to Melendez and YA;

instead, the school launched their "defensible position" strategy: first, fabricate facts; second, discredit the victim.

69.    Defendant Graves first falsified facts in an attempt to show that Weber's accusation of YA's cheating was *before*, not *after* the Melendez and YA complaints and thus not retaliation.

70.    Defendant Graves then employed the school's "defensible position" strategy to discredit and intimidate Melendez and YA in an effort to undermine their complaint of Weber's (and the school's) racial discrimination against YA.  In addition to lying about the sequence of the complaints and the retaliation, Defendant Graves used his fabricated facts to conclude that Weber's accusation justified a formal Academic Integrity Board investigation into YA "cheating" on an in-class exercise.

71.    Upon information and belief, the ECFS Academic Integrity Board has the power to unilaterally and arbitrarily make a finding that a student has cheated on an examination. It would be emotionally and academically devastating for a high-achieving, college-bound high school student to be found guilty of cheating by the ECFS Academic Integrity Board. The Academic Integrity Board serves ECFS's defense strategy as a bludgeon against any student or parent making a complaint of racial hostility.

72.    Melendez objected to the ECFS effort to further disparage and

irreparably damage YA, and informed Defendant Graves by email that Weber had a history of discriminatory bullying. Melendez cited a published news article available online that reported that Weber, in her previous position as a principal at another school, created a climate of fear, hostility, and rumor against a gay teacher who was terminated while Weber was the school principal.

73.     Defendant Graves responded by threatening Melendez with legal consequences for making "inappropriate, defamatory and quite frankly irrelevant" points about Weber. Graves informed Melendez that she could not question the professionalism or integrity of YA's accuser, Weber.

74.     According to Graves, the ECFS Academic Integrity Board could rule on Weber's accusation of cheating against YA, but Melendez was not permitted to cite the history of bias and lack of integrity of Weber.

75.     Later that same week, Weber used her classroom forum to continue her racially biased and retaliatory attack on YA. During a ninth-grade advisory class, which YA did not attend, Weber organized a word game called "Taboo" where the students had to guess a particular word based on clues from the teacher.  On this particular occasion, Weber choose the word "lie" as the particular word to be guessed and used as a hint the statement: "this is what you do when your teacher says you're cheating on a test."

76.     YA learned from other students that Weber was using her status and

role as a teacher to unabashedly call YA a liar and a cheat with the intent to

devastate YA's sense of safety, well-being, and self-esteem, as well as to

compromise YA's academic future.

77.     Rather than protect YA from retaliation, the school permitted and

condoned Weber's racially motivated and grossly unprofessional attack on YA, and

sought to punish Melendez and YA.

78.     Within days of these events, Melendez retained counsel who wrote a

letter to the school threatening litigation and demanding that the school stop its

retaliation against Melendez and YA.

79.     Upon information and belief, during the summer of 2022, Plaintiffs,

Melendez, YA and YS, had discussions with the school through prior counsel in an

effort to resolve the issues. The school informed Plaintiffs' then-counsel in July that

the school was demanding as part of a resolution that Melendez withdraw both of

her children, YA and YS, from the school.

80.     There was no agreement to resolve the issues.  The school then

consummated its retaliation against the family—the Head of School, Defendant Joe

Algrant expelled *YS* who was enrolled and prepared to begin fourth grade in a matter

of days.

81.     The abrupt expulsion of YS at the beginning of the school year was an

extreme hardship for Melendez and YS and caused additional emotional damage to

YA. The elementary school application process for the 2022-23 academic year was over; Melendez and her daughter YS were preparing to start fourth grade at ECFS in the coming weeks. The school's abrupt, retaliatory expulsion of Melendez's fourth-grader was malicious and needlessly disruptive to YS and distressful to YA.

82.    ECFS's expulsion of fourth-grader YS was not just blatant retaliation against Melendez and YA; ECFS was sending a clear message to other students and families of color at the school that criticism of the school's racially hostile environment would have dire consequences.

83.    The action by Defendant Algrant and ECFS to expel YS from the elementary classes she had been attending since pre-kindergarten was racially discriminatory, malicious, vindictive, and retaliatory.

84.    There was no legitimate business or pedagogical reasons or other good faith basis for Defendant Algrant or ECFS to refuse to enroll YS in the fourth grade. Defendant Algrant and the school's decision was a malicious and spiteful act designed to hurt the child to punish the mother.

*Institutional Racism at ECFS*

85.    ECFS' practice of evaluating the academic performance of students of color betrays the pervasive and systemic nature of the school's racial bias against students of color.

86.    At times relevant to this Complaint, about 20% of the high school

19

consists of students of color and about 80% of the students are white.

87.   Throughout high school (and the lower schools), ECFS maintained four different levels for the study of mathematics, and the school determined the placement of each student, including YA and YS, in one of the four levels of mathematics, based purportedly on the student's ability in mathematics.

88.   In the ordinary course and in the absence of discrimination, the distribution of students in the various levels of mathematics should be reflective of the entire population of students for each grade.

89.   At ECFS, however, about 60% of the students in the lowest level of mathematics were students of color, which represented a significant statistical departure from the standard deviation that would be otherwise expected from an objective and unbiased evaluation of each student's abilities.

90.   As a result of the school's racist attitudes and racial stereotyping of students of color, YA and YS and other students of color were improperly placed in a lower level of mathematics than their abilities justified.

91.   As a result of their placement in mathematics classes at ECFS, YA and YS were denied important academic benefits and college opportunities that were afforded to white students.

92.   For example, the opportunity to demonstrate a high aptitude in mathematics is an important factor in college admissions applications accepted by

top-level universities. YA and YS were denied this opportunity by being routinely assigned to lower-level mathematics classes as a result of ECFS's racial preconceptions of students' abilities.

*Damages*

93.     As a result of the Defendants' conduct, YA, YS, and Melendez have suffered severe emotional trauma and a loss of self-confidence and self-esteem.

94.     YA, YS, and Melendez continue to suffer emotional trauma from their experiences at ECFS; disturbing, reoccurring, and intrusive thoughts about ECFS and their experiences at the school still overshadow their lives.

95.     Melendez was traumatized by the way that the school treated her daughters and by the way that the racially toxic environment damaged her daughters.

96.     Defendants ECFS, Bagby, Weber, Graves, and Algrant have acted maliciously and knowingly in violating the Plaintiffs' rights and are liable to the Plaintiffs for punitive damages as well as compensatory damages.

## FIRST CLAIM FOR RELIEF
(42 U. S. C. § 1981 Discrimination and Retaliation)

97.     Plaintiffs repeat the foregoing allegations as if set forth herein at length.

98.     Defendants, acting on the basis of racial discrimination, have denied the Plaintiffs the full and equal benefits of all law, proceedings, and contractual relations for the security of persons and property as are enjoyed by white persons, in violation of 42 U. S. C. § 1981.

99.    Defendants have retaliated against the Plaintiffs for demanding that they be treated equally, for threatening legal action against the Defendants for race discrimination, and for objecting to race discrimination in violation of 42 U. S. C. § 1981.

100.    Defendants have denied the Plaintiffs the equal terms and conditions of the contractual relationship in connection with the Plaintiffs' enrollment at ECFS as those terms and conditions are enjoyed by white persons in violation of 42 U. S. C. § 1981.

101.    As a direct and proximate result of the Defendants' unlawful actions, the Plaintiffs have suffered damages, including monetary loss and mental anguish, emotional distress, embarrassment, stress, anxiety, and loss of self-esteem, for which they are entitled to an award of money damages in an amount to be established at trial.

SECOND CLAIM FOR RELIEF
(New York Constitutional and Executive Law Discrimination,
Retaliation, and Aiding and Abetting)

102.    Plaintiffs repeat the foregoing allegations as if set forth herein at length.

103.    Defendants have violated New York Executive Law § 296 *et seq.,* and Section 11 of the New York State Constitution by discriminating against the Plaintiffs on the basis of their race and color and have specifically violated New York Executive Law § 296(4) by permitting and aiding and abetting harassment at

ECFS against the Plaintiffs because of their race and color.

104.   Defendants have violated New York Executive Law § 296 *et seq.,* and § 296(7) by retaliating against the Plaintiffs for opposing the Defendants' unlawful practices and by taking actions against them that were designed to inhibit or punish the Plaintiffs from exercising their rights.

105.   As a direct and proximate result of the Defendants' unlawful actions, the Plaintiffs have suffered damages, including monetary loss and mental anguish, emotional distress, embarrassment, stress, anxiety, and loss of self-esteem, for which they are entitled to an award of money damages and in an amount to be established at trial.

106.   Defendants Bagby, Weber, Graves, Algrant, and Defendants John and Jane Does knowingly and actively participated in and aided and abetted the unlawful practices, discrimination and retaliation against the Plaintiffs in violation of the New York Executive Law.

THIRD CLAIM FOR RELIEF
(New York City Administrative Code Discrimination,
Retaliation, and Aiding and Abetting)

107.   Plaintiffs repeat the foregoing allegations as if set forth herein at length.

108.   Defendants have discriminated against the Plaintiffs as providers of a public accommodation; have retaliated against Plaintiffs on account of their race and color and for engaging in protected conduct; and have interfered with their protected

rights, in violation of New York City Administrative Code § 8-107(4), § 8-107(7), § 8-107(19) and § 8-107 *et seq.*

109.   Defendants have violated New York City Administrative Code § 8-107(4), § 8-107(7), and § 8-107(19) by retaliating against the Plaintiffs for opposing the Defendants' unlawful practices and by taking actions against them that were designed to inhibit or punish the Plaintiffs from exercising their rights.

110.   Pursuant to NYC Adm. Code §8-502(c), the Plaintiffs will serve a copy of this Complaint to the NYC Commission on Human Rights and the NYC Law Department.

111.   As a direct and proximate result of the Defendants' unlawful actions, the Plaintiffs have suffered damages, including monetary loss and mental anguish, emotional distress, embarrassment, stress, anxiety, and loss of self-esteem, for which they are entitled to an award of money damages in an amount to be established at trial.

112.   Defendants Bagby, Weber, Graves, Algrant, and Defendants John and Jane Does knowingly and actively participated in and aided and abetted ECFS's unlawful practices, discrimination, and retaliation against the Plaintiffs in violation of New York City Administrative Code § 8-107(6).

WHEREFORE, the Plaintiffs demand the following relief jointly and severally against all the Defendants:

(a)     a declaration that each one of the Defendants violated the Plaintiffs' federal rights as well as their rights under the laws of the City of New York and the State of New York;

(b)     compensatory damages for emotional and reputational injuries suffered by the Plaintiffs by reason of each Defendant's unlawful and unjustified conduct, in a just and reasonable amount in conformity with the evidence at trial;

(c)     punitive damages against each Defendant to the extent allowable by law;

(d)     reasonable attorneys' fees pursuant to 42 U. S. C. §§ 1988, N.Y. Executive Law § 297, and the New York City Administrative Code, Section 8-502(f);

(e)     costs and disbursements of this action; and

(f)     such further relief as appears to the Court to be just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated: New York, New York
        June 12, 2023

By: *s/Nathaniel B. Smith*
_____
Nathaniel B. Smith
225 Broadway – Suite 1901
New York, New York 10005
(212) 227-7062
natbsmith@gmail.com

John D. Lenoir
4603 Parkwood Road
Austin, Texas
(212) 335-0250
john.lenoir@lenoir-attorney.com