UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CRISTINA MELENDEZ, *et al.*,

Plaintiffs,

-v-

ETHICAL CULTURE FIELDSTON
SCHOOL, *et al.*,

Defendants.

23-CV-4917 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

This case, brought by Cristina Melendez and her minor daughters Y.A. and Y.S.,

involves race discrimination and retaliation claims against the Ethical Culture Fieldston School

("ECFS") and several of its employees.  All defendants, save for one, argue that Melendez

agreed to binding arbitration when she signed enrollment contracts on behalf of her daughters.

Melendez disagrees, contending that Y.A. and Y.S. may—and did—void their enrollment

contracts.  Melendez also argues, by implication, that the voidness determination is one for a

court to make.  The disagreement raises two questions relatively new to this Circuit.  The first is

a matter of federal arbitration law: whether a court, or an arbitrator, is to decide whether a minor

has repudiated a contract.  The second is a matter of New York contract law: whether a minor

may repudiate a contract for secondary education, executed on her behalf, that purports to bind

the minor to arbitration.  Concluding that a court is to determine whether a minor has repudiated

a contract, and that a minor may repudiate an education contract executed on her behalf, the

Court denies the motion to compel arbitration as to Y.A. and Y.S.  But because adults cannot

similarly void contracts that they have signed on behalf of minors, and because the enrollment

contracts in this case are otherwise enforceable, the Court grants the motion as to Melendez.

## I.    Background[1]

Melendez's daughters, Y.A. and Y.S., are sixteen and ten years old, respectively.  Until recently, both attended ECFS, "an exclusive, expensive, and predominantly white private school" in the Bronx.  (ECF No. 4 ("Compl.") ¶¶ 2-4.)  Melendez and her daughters are people of color (*id.* ¶¶ 1, 2-3), and the children attended ECFS with the aid of scholarships provided to "lower-income minority students" (*id.* ¶ 13).  Y.A. attended for ten years—from kindergarten to just before the end of her ninth-grade year in 2022—during which she was accused of cheating by her math teacher and voluntarily withdrew.  (*Id.* ¶¶ 14-15.)  Y.S. attended from pre-kindergarten through third grade and, though she initially enrolled for fourth grade, was dismissed in Fall 2022 a few days before the school year began.  (*Id.* ¶¶ 16, 80.)  Plaintiffs allege that the accusations of cheating leveled at Y.A., and the expulsion of Y.S., were the products of a broader culture of racial hostility and discrimination at ECFS.  (*See id.* ¶¶ 15-20.)  They assert claims for violation of 42 U.S.C. § 1981, which prohibits race discrimination in contracting, as well as for violations of state and local constitutional and statutory law prohibiting discrimination.  (*See id.* ¶¶ 97-112.)  Melendez, Y.A., and Y.S. are all individual plaintiffs in this action.  (*See id.* ¶¶ 1-3.)  Defendants are ECFS, several of its administrators, and Y.A.'s math teacher.  (*See id.* ¶¶ 4-9.)

Each year, upon enrolling Y.A. and Y.S. at ECFS, Melendez signed enrollment contracts on her daughters' behalf.  (*See* ECF No. 39 ¶¶ 3-6.)  At issue in this case are the enrollment contracts governing the 2021-22 and 2022-23 school years, which contain terms relating to, among other things, tuition, field trips, and use of the internet.  (*See* ECF Nos. 39-1 ("2021-22

---

[1] The following facts are drawn from the parties' submissions and, unless disputed, presumed true for the purposes of resolving the motion to compel arbitration.

Enrollment Contract"); 39-3 ("2022-23 Enrollment Contract").)  The agreements also both contain provisions requiring parents and ECFS to arbitrate disputes relating to or concerning the contracts.  (*See* 2021-22 Contract at 6-7; 2022-23 Contract at 7-8.)  The 2021-22 Enrollment Contract's arbitration clause provides:

> In the event that any dispute, controversy or claim relating to or concerning this Contract or breach thereof, arises, the Parents' [*sic*]² agree to participate in a mediation administered by the American Arbitration Association (the "AAA") in New York, New York to settle the dispute before resorting to any other dispute resolution procedure.

> In the event that any dispute, controversy or claim relating to or concerning this Contract or breach thereof [which could not be successfully resolved through mediation], arises, such dispute, controversy, or claim, shall be finally settled exclusively by arbitration in New York, New York, conducted through the American Arbitration Association ("AAA") before a single arbitrator using the procedures set forth in the Commercial Arbitration Rules of the AAA in effect at the time of the arbitration.  The arbitration proceedings will be confidential. The arbitrator's award will be final and binding upon all parties to the arbitration and judgment upon the award may be entered in any court of competent jurisdiction in any state of the United States.  The Parents' understand that the Parents' will bear their own costs and expenses incurred in connection with any such arbitration proceeding.  For purposes of any actions or proceedings ancillary to the arbitration referenced above (including, but not limited to, proceedings seeking to enforce an arbitration award), the parties agree to submit to the exclusive jurisdiction of the state and federal courts of New York, New York County and agree to waive any right to a jury trial.  The arbitrator will be able to decree any and all relief of an equitable nature, including, but not limited to, such relief as a temporary restraining order or a temporary and/or permanent injunction, and will also be able to award damages, with or without an accounting.  In the event there are any claims that cannot be subject to mandatory arbitration as a matter of law, the Parents agree to submit such claims to the exclusive jurisdiction of the state and federal courts of New York, New York County and the Parents' agree to waive any right to a jury trial.  To the maximum extent permitted by law, the Parents' hereby waive the right to assert any claims against the School on a class action, collective action, or representative action basis either in court or in arbitration, and agree to waive the right to serve or participate as a class, collective or representative action member or representative or to receive any recovery from a class, collective or representative action involving claims against the School either in court or in arbitration.  This dispute resolution procedure is fixed, and not subject to change

---

² The plural-possessive form of "Parents" appearing in several places in the contracts is presumably a drafting error.

regardless of any changes to the School's rules, regulations, publications, or handbooks.

(2021-22 Enrollment Contract at 6-7 (second pair of brackets in original).)  The 2022-23

Enrollment Contract's arbitration clause—different in some ways from the prior year's—

provides:

> PLEASE READ THIS SECTION CAREFULLY.  BY AGREEING TO THIS CONTRACT, INCLUDING THIS ARBITRATION PROVISION, YOU ARE WAIVING YOUR RIGHT [AND YOUR CHILD'S RIGHT] TO LITIGATE ANY CLAIMS IN COURT, TO PROCEED BEFORE A JURY, AND TO PARTICIPATE IN ANY REPRESENTATIVE OR CLASS ACTION.

> The Parents agree, for themselves and for the Student, that any dispute, controversy, or claim brought by or on behalf of the Parents or the Student, arising out of or relating to this Contract, including related to the validity or enforceability of this arbitration clause, or any alleged breach, violation, or default of this Contract, together with any dispute, controversy, or claim of any nature regarding any aspect of the Parents' or the Student's relationship with the School (including any current or former School employee), shall be settled exclusively and finally by arbitration at the election of any party, as described herein.  For the avoidance of doubt, neither the Parents, nor the Student, nor the School (nor any current or former employee) shall pursue any dispute, controversy or claim described in the preceding sentence in any venue other than arbitration without first providing the other party to the dispute with the opportunity to invoke such party's right to elect arbitration pursuant to the preceding sentence.  Arbitration will take place in New York, New York, conducted through the American Arbitration Association ("AAA") before a single arbitrator using the procedures set forth in the Consumer Arbitration Rules of the AAA in effect at the time of the arbitration.  The Consumer Arbitration Rules include additional information regarding the arbitration process, including the process by which a party may initiate arbitration, and are available at https://adr.org/sites/default/files/Consumer%20Rules.pdf.    The arbitration proceedings will be confidential. The arbitrator will be able to decree any and all relief of an equitable nature, including, but not limited to, such relief as a temporary restraining order or a temporary and/or permanent injunction, and will also be able to award damages, with or without an accounting. Arbitration fees and costs will be allocated pursuant to the Consumer Arbitration Rules.

> The arbitrator may only resolve disputes between the Student and/or the Parents, on their own behalf and on behalf of the Student, and the School (including any current or former School employee), and may not consolidate claims without the consent of all parties.  The arbitrator cannot hear class or representative claims or requests for relief on behalf of persons other than the Parents or their child (the Student).  In other words, the Parents may bring claims against the School (including any current or former School employee) only in their individual

capacity, on behalf of themselves or their child (the Student), and not as a plaintiff or class member in any class or representative action. Likewise, the Student may bring claims only in his or her individual capacity, and not as a plaintiff or class member in any class or representative action.

The arbitrator's award will be final and binding upon all parties to the arbitration and judgment upon the award may be entered in any court of competent jurisdiction in any state of the United States. In any action to enforce an arbitration award, the Parents and the School agree to submit to the exclusive jurisdiction of the state and federal courts of New York, New York County AND AGREE TO WAIVE ANY RIGHT TO A JURY TRIAL IN ANY ACTION TO ENFORCE AN ARBITRATION AWARD.

In the event there are any claims that cannot be subject to mandatory arbitration as a matter of law, the Parents and/or the Student agree to submit such claims to the exclusive jurisdiction of the state and federal courts of New York, New York County AND AGREE TO WAIVE ANY RIGHT TO A JURY TRIAL. To the maximum extent permitted by law, the Parents and /or the Student hereby waive the right to assert any claims against the School in a class action, collective action, or representative action basis either in federal or state court or in arbitration, and agree to waive the right to serve or participate as a class, collective or representative action member or representative or to receive any recovery from a class, collective or representative action involving claims against the School either in federal or state court or in arbitration. This dispute resolution procedure is fixed, and not subject to change regardless of any changes to the School's rules, regulations, publications, or handbooks, absent a written agreement by and between the parties to this Contract.

(2022-23 Enrollment Contract at 7-8 (brackets in original).)

Notwithstanding the arbitration provisions, Plaintiffs filed the instant action on June 12, 2023. (*See* ECF No. 1.) The Court accepted the assignment of the case as related to other actions, brought by ECFS students alleging race discrimination by the school, pending before the undersigned. (*See* ECF Nos. 8, 10; Minute Entry Dated June 20, 2025.) The case was stayed pending the Court's resolution of a motion in a related case, *Emile v. Ethical Culture Fieldston School*, 21-CV-3977. (*See* ECF No. 13.) Then, on April 26, 2024, the parties jointly moved for and were subsequently referred to a settlement conference before Magistrate Judge Sarah L. Cave. (ECF Nos. 15, 16.) A series of settlement conferences took place over the next several months, during which the case remained stayed. (*See* ECF Nos. 18-31.) The Court then held a

status conference on October 7, 2024, during which Defendants (except for Weber) indicated their intent to move to compel arbitration pursuant to the enrollment contracts.  (*See* ECF No. 34.)  Defendant Weber filed an answer to the complaint on November 8, 2024.  (ECF No. 36.)

The remaining defendants (collectively, the "Movant Defendants") moved to compel arbitration on November 8, 2024 (ECF No. 37) and filed a memorandum of law in support (ECF No. 38 ("Mem").  Plaintiffs opposed the motion on December 13, 2024.  (ECF No. 43 ("Opp.").)  The Movant Defendants replied in further support of their motion on January 24, 2025.  (ECF No. 46 ("Reply").)

## II.    Discussion

### A.    Applicability of the Federal Arbitration Act

The Federal Arbitration Act ("FAA") provides for the enforcement of "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction."  9 U.S.C. § 2.  The phrase "involving commerce" sweeps broadly, encompassing all contracts which Congress may regulate pursuant to its Article I Commerce Clause power.  *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 268 (1995); *see also Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 112 (2001) (noting that Section 2 evinces Congressional "intent to exercise its commerce power to the full" (cleaned up)).  Therefore, contracting parties need not "contemplate an interstate commerce connection" for their agreements to involve commerce for the purposes of the FAA.  *Allied-Bruce*, 513 U.S. at 281.  Instead, the contract must simply *affect* interstate commerce, including "if in the aggregate the economic activity in question would represent 'a general practice [] subject to federal control.'"  *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 57 (2003).  Nevertheless, Melendez contends that the Movant Defendants have not made a showing that the enrollment contracts

involve interstate commerce, and thus the FAA—with its provisions preempting state laws more restrictive of arbitration—does not govern this case. (*See* Opp. at 13-14.)

The enrollment contracts at issue here fall within the scope of Congress's Article I commerce powers and thus, if they contain valid arbitration provisions, must be enforced according to the FAA. It is true that those agreements primarily concern the amount and schedule of tuition payments. (*See, e.g.*, 2021-22 Enrollment Contract at 2-3.) But the contracts contain many other terms, including a reserved right for ECFS to withhold "grades, transcripts, recommendations" to "colleges or universities" in the event of nonpayment. (*See id.* at 3.) The contracts also authorize student participation in "School-sponsored field trips," "including riding in buses or other vehicles chartered by the School, taxicabs, subways, or vehicles driven by employees or representatives of the School." (*Id.* at 4.) And they purport to constitute the parents' consent to their children's use of third-party online learning platforms. (*See id.* at 4-5.) All of those provisions affect interstate commerce, such as the interstate market for university recommendations and admission, *see Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 128 F.3d 59, 65 (2d Cir. 1997), field trips using the channels of interstate travel, *see Heart of Atl. Motel, Inc. v. United States*, 379 U.S. 241, 256-58 (1964), and the use of internet services, *see Am. Librs. Ass'n v. Pataki*, 969 F. Supp. 160, 173 (S.D.N.Y. 1997). That conclusion is only bolstered by considering the aggregated effect of those activities on interstate commerce. *Cf. Citizens Bank*, 539 U.S. at 57-58. Accordingly, the FAA governs the purported arbitration provisions in this case.

**B.    Legal Standards**

The FAA, reflecting a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), provides that parties "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written

agreement for arbitration may petition any United States district court" which would otherwise have jurisdiction over the subject matter of the dispute to enforce the agreement.  9 U.S.C. § 4.  So, too, may a party already litigating in district court file a motion to compel arbitration.  9 U.S.C. § 6.  In deciding motions to compel arbitration under Sections 4 and 6 of the FAA, "the court applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *see also Meyer v. Uber Techs.*, 868 F.3d 66, 74 (2d Cir. 2017).  In doing so, the court must "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (cleaned up).  "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Id.* (quotation marks omitted).

The FAA also supplies substantive principles governing the enforcement of agreements to arbitrate.  Four are most relevant here.  *Cf.  Pilon v. Discovery Commc'ns, LLC*, 769 F. Supp. 3d 273, 286 (S.D.N.Y. Mar. 10, 2025).  First, because agreements to arbitrate are contracts, the Court must determine that the parties in fact made such an agreement, notwithstanding any delegation or arbitration clause.  *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148-49 (2024).  That includes the determination of whether the party requesting arbitration has waived that right by litigating.[3]  *See La. Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

---

[3] The proper role of state law in determining whether a party waived their contractual right to arbitration has not yet been determined by the Supreme Court, though it recently assumed without deciding that the question is governed by federal, rather than state, law.  *See Morgan v. Sundance, Inc.*, 596 U.S. 411, 416 (2022) ("In their briefing, the parties have disagreed about the role state law might play in resolving when a party's litigation conduct

626 F.3d 156, 159-61 (2d Cir. 2010) (considering whether a party waived its right to arbitration without regard to the scope of the underlying arbitration provision).  Second, if the parties indeed formed an agreement to arbitrate, the Court must determine whether or not the parties also agreed to delegate questions of arbitrability (that is, the scope and enforcement of the arbitration provision) to the arbitrator.  *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." (cleaned up)); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 72 (2019).  Third, the Court must be assured that challenges to the arbitration provision (or, in the event that the parties delegated the arbitrability determination to the arbitrator, the delegation provision) are to that provision specifically, rather than to the parties' entire agreement.  *See Pilon*, 769 F. Supp. 3d at 286 (citing *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448-49 (2006) and *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010)).  And if, after all of that, the Court is to consider challenges to the enforceability of the arbitration provision, it is to apply the general contract principles of the applicable state's contract law.  9 U.S.C. § 2; *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987).

C.    **Validity and Waiver of the Arbitration Provisions**

The Court must first determine whether the parties formed a still-valid agreement to arbitrate and, even if they did, whether the Movant Defendants waived their right to invoke that agreement by choosing to litigate.

---

results in the loss of a contractual right to arbitrate. . . . The Courts of Appeals, including the Eighth Circuit, have generally resolved cases like this one as a matter of federal law, using the terminology of waiver.  For today, we assume without deciding they are right to do so.").

### 1.    Validity of the Enrollment Contracts

The formation of an agreement to arbitrate is governed by the applicable state's contract law. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012). Everyone here agrees that the applicable law is New York's, under which, "in order to be binding, a contract requires a 'meeting of the minds' and a 'manifestation of mutual assent.'" *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288-89 (2d Cir. 2019) (quoting *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999)). "Generally, courts look to the basic elements of the offer and the acceptance to determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Id.* at 289. Plaintiffs do not contend in any filing that the manner in which the purported contracts at issue were executed—via an electronic signature—prevented their formation.

Instead, Plaintiffs argue that the contracts at issue are voidable on account of Y.A.'s and Y.S.'s infancy at the time the contracts were executed. (*See* Opp. at 11-13.) "Contracts signed by minors are voidable, not void." *Doe #1 v. College Bd.*, 440 F. Supp. 3d 349, 355 (S.D.N.Y. 2020) (citing *I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 208 (S.D.N.Y. 2015)). Plaintiffs contend that the contracts have been voided, and are therefore unenforceable. (*See* Opp. at 11.) As is discussed more thoroughly later, challenges to enforceability are ordinarily left to the arbitrator, so long as the challenge is not to the arbitration provision in particular. *See infra* § III.C. But that rule is founded upon the Court's ability to sever and separately enforce a valid arbitration provision contained in an otherwise potentially unenforceable agreement. *See Buckeye*, 546 U.S. at 445 (holding that if a challenge to a contract "goes to the making of the agreement to arbitrate[,] the federal court may proceed to adjudicate it"); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967) ("[I]n passing upon a [§] 3 application for a stay while the parties arbitrate, a federal court may consider only

10

issues relating to the making and performance of the agreement to arbitrate.").  Therefore, one application of *Buckeye*'s severability rule requires courts to resolve challenges to the formation of a contract, rather than to its enforceability, because in order for an arbitration provision to be severed and enforced, it must have been formed in the first place.  *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010).  That makes sense, because even if a challenge to formation of a contract containing an arbitration provision is leveled at the contract as a whole, if the challenge prevails, it renders the arbitration provision—even severed—invalid.  *See Coinbase*, 602 U.S. at 151 ("[*Buckeye*'s] rule does not require that a party challenge *only* the arbitration or delegation provision.  Rather, where a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address the challenge.").  Thus, legal objections to the severability of an arbitration provision, under *Buckeye*, must be resolved by the Court.

That matters in this case because when a minor has elected to void a contract, it is based on her incapacity to enter into any binding contract (with the exception of those for necessaries), rather than her incapacity to bargain for particular subject matter.  It follows that "a minor who has disaffirmed a contract is not subject to the contract's [arbitration] provision," for there is no valid provision to be severed from the voided contract.  *In re StockX Consumer Data Sec. Breach Litig.*, 19 F.4th 873, 888 (6th Cir. 2021) (Moore, J., dissenting).  Any other rule would improperly "elevate [agreements to arbitrate] over other forms of contract," permitting minors to enter binding contracts for arbitration but essentially nothing else.  *Id.* (quoting *Rent-A-Center*, 561 U.S. at 71).[4]  The FAA does not permit such outcomes.  *See Morgan v. Sundance*, 596 U.S.

---

[4] The Sixth and Seventh Circuits have taken a contrary view.  *See In re StockX*, 19 F.4th at 882-84 (holding that *Buckeye* requires severing and enforcing an arbitration provision contained in a purportedly voided contract originally executed by a minor); *K.F.C. v. Snap Inc.*,

411, 418 (2022) ("[A] court may not devise novel rules to favor arbitration over litigation."). Thus, in order to sever and enforce the enrollment contracts' arbitration provisions, the Court must be assured that the parties have validly contracted at least for arbitration. And that requires resolving Plaintiffs' arguments that the enrollment contracts—and their arbitration provisions— have been voided.[5]

Everyone here agrees on the general principle that "while a party has an absolute right to disaffirm a contract entered into as a minor within a reasonable time after becoming of age,[6]

_____

29 F.4th 835, 837-38 (7th Cir. 2022) (relying on *In re StockX* for the same rule). This issue is also before the Ninth Circuit, after Judge Huie concluded along the same lines as the Sixth and Seventh Circuits. *See S.T.G. v. Epic Games, Inc.*, 752 F. Supp. 3d 1200, 1206-11 (S.D. Cal. 2024), *appeal pending*, No. 24-6443 (9th Cir.). Largely for the reasons stated in Judge Moore's dissenting opinion in *In Re StockX*, the Court is persuaded that a proper application of *Prima Paint*, *Buckeye*, and *Rent-A-Center* requires courts, rather than arbitrators, to decide voidability challenges to contracts executed by minors that contain arbitration provisions. That likewise comports with the Supreme Court's allusion to mental capacity challenges as a category of formation issues, *see Buckeye*, 546 U.S. at 444 n.1; *see also Spahr v. Secco*, 330 F.3d 1266, 1273 (10th Cir. 2003) ("[T]he analytical formula developed in *Prima Paint* cannot be applied with precision when a party contends that an entire contract containing an arbitration provision is unenforceable because he or she lacked the mental capacity to enter into the contract. Unlike a claim of fraud in the inducement, which can be directed at individual provisions in a contract, a mental capacity challenge can logically be directed only at the entire contract."). At bottom, the operative principle in *Buckeye*, *Granite Rock*, *Prima Paint*, and *Rent-A-Center* is not simply the distinction between formation and enforceability challenges, but the more general potential for severability and enforcement. Thus, where a contract challenge (however categorized by the relevant state's law) implicates the ability to sever and enforce an arbitration (or delegation) provision, it is for a court to resolve.

[5] The Movant Defendants argue that the issue of the contracts' voidability is for the arbitrator to decide because of the contracts' delegation provisions. (Mem. at 17.) But because, as already explained, a court must decide whether a minor properly voided a contract containing an arbitration provision before it may enforce that arbitration provision, the delegation clause likewise may be enforced only once the Court is satisfied that the contract containing it is valid. *See Coinbase*, 602 U.S. at 151 ("[W]here a challenge applies 'equally' to the whole contract and to an arbitration *or delegation* provision, a court must address that challenge." (citing *Rent-A-Center*, 561 U.S. at 71) (emphasis added)).

[6] The Movant Defendants do not argue that the enrollment contracts are for "necessaries" and so may not be voided even by minors. *See CBS, Inc. (Cbs Recs. Div.) v. Tucker*, 412 F. Supp. 1222, 1226 n.6 (S.D.N.Y. 1976) ("It is well-recognized that contracts for 'necessaries' are generally excepted from the rule which allows minors to disaffirm contracts made during

after disaffirmance a minor is not entitled to retain an advantage from a transaction which he

repudiates." *Doe #1 v. Coll. Bd.*, 440 F. Supp. 3d 349, 355 (S.D.N.Y. 2020) (cleaned up).[7]  In

other words, "a minor cannot disaffirm a contract where doing so would put her in a better

position than she otherwise would have been absent the contract." *I.C. ex rel. Solovsky v. Delta

Galil USA*, 135 F. Supp. 3d 196, 209 (S.D.N.Y. 2015).  The Movant Defendants argue that

Plaintiffs have elected to retain the benefits of the contracts at issue here in large part because of

their Section 1981 claim for the denial of "the equal terms and conditions of [a] contractual

relationship in connection with the Plaintiffs' enrollment at ECFS as those terms and conditions

are enjoyed by white persons in violation of 42 U.S.C. § 1981."  (Compl. ¶ 100; *see also* Mem.

---

infancy." (citing *Int'l Text Book Co. v. Connelly*, 206 N.Y. 188 (1912)).  Whether an education
contract constitutes a necessary often raises difficult questions of fact concerning the type of
education and other options available to a minor; but in all cases, the burden of establishing that
the contract is for a necessary lies with the party seeking to enforce it.  *Int'l Text Book*, 206 N.Y.
at 195 (1912); *see also Fisher v. Cattani*, 278 N.Y.S.2d 420, 422 (Dist. Ct. Nassau Cnty. 1966)
(noting a statutory exception to the general doctrine providing that "an infant, over 16, may not
disaffirm, upon the ground of infancy, an agreement extending credit to him for an educational
loan").  Because the burden to show that the enrollment contracts are for necessaries lies with the
Movant Defendants (an argument that appears unlikely to succeed under the circumstances of
this case) and they have made no such showing, the Court need not determine whether Y.A. and
Y.S. are bound to the enrollment contracts for that reason.  *See Przestrzelski v. Bd. of Educ. of
Ft. Plain Sch. Dist.*, 419 N.Y.S.2d 256, 257 (3d Dep't 1979) (holding that an infant need not
plead a lack of necessity to void a contract and recover expenses paid under it).

[7] The Movant Defendants' alternative argument—that minors are simply bound to
contracts executed by their parents on the children's behalf—is incorrect.  *See Hantash v. Model
Mgmt. N.Y., Inc.*, No. 07-CV-3363, 2007 WL 2324326, at *1 (S.D.N.Y. Aug. 7, 2007)
(parenthetically quoting *Shields v. Gross*, 448 N.E.2d 108, 112 (N.Y. 1983) (Jasen, J.,
dissenting), for the proposition that "a minor enjoys an almost absolute right to disaffirm a
contract entered into either by the minor or by the minor's parent on behalf of the minor");
*Goldfinger v. Doherty*, 276 N.Y.S. 289, 292-93 (1st Dep't 1934) ("The infant, without
questioning the authority of his agent, may disaffirm the contract entered into on his behalf, in
the same manner as if he had made the contract directly.").  The Movant Defendants' citation to
*Cutway v. S.T.A.R. Programs, Inc.*, is unavailing, as that case did not consider New York's
infancy doctrine or whether the minor plaintiffs had voided the contract at issue.  *See* 904
N.Y.S.2d 806, 812 (3d Dep't 2010); *see also S.S. v. Peloton Interactive, Inc.*, 566 F. Supp. 3d
1019, 1037 (S.D. Cal. 2021) (distinguishing *Cutway* based, in part, on the plaintiff in *S.S.* having
"lacked the ability to consent and maintained the ability to disaffirm the contract").

at 18-19; Reply at 12-13.)  But that claim does not seek to enforce the enrollment contracts.

Instead, it seeks to impose statutory liability on Defendants for withholding the benefits of

contracts—that *once existed*—on the basis of race.  Plaintiffs' argument now that the contracts

have since been voided is thus consistent with that theory.  *See Goldfinger v. Doherty*, 276

N.Y.S. 289, 292 (1st Dep't 1934) ("There is . . . no basis for the contention . . . that disaffirmance

by the infant of a contract entered into on his behalf by his agent renders the transaction void ab

initio . . . ."); *see also Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) ("Section

1981 offers relief when . . . racial discrimination impairs an existing contractual relationship, so

long as the plaintiff has *or would have* rights under the existing or proposed contractual

relationship." (emphasis added)); *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 372-73

(2004) (noting that Section 1981 now makes actionable racial discrimination in contract

termination).  And that is a sensible result, as a minor who executes a contract (or whose parents

execute a contract on the minor's behalf) and is subsequently denied the benefits of that contract

on the basis of race would have ample reason to want to repudiate that contract.  New York's

infancy doctrine is designed to relieve minors of the burdens of bad deals, not to stick them to

them.  And Section 1981 makes one particular type of bad deal—the discriminatory denial of a

contract benefit—independently actionable.  Those are harmonious doctrines rather than

contradictory ones.

The Movant Defendants argue also that Y.A. and Y.S. accepted the benefits of several

months of schooling following the execution of the enrollment contracts, and are thus precluded

from now voiding those contracts.  That is incorrect, as a matter of both timing and substance.

Begin with the former.  Y.A. was accused of cheating and voluntarily withdrew from ECFS in

April 2022, just before the completion of ninth grade.  (Compl. ¶ 14.)  Y.S. was asked to leave

voluntarily in July 2022 (*id.* ¶ 79), and was expelled from ECFS in September 2022, days before the beginning of fourth grade and after already having enrolled (*id.* ¶ 16). Many of Plaintiffs' claims sound in retaliation, arising from events specifically in 2022. (*See, e.g.*, *id.* ¶¶ 99, 104, 106, 108, 112.) The Movant Defendants contend that the relevant contracts containing arbitration provisions are those "governing the terms of YA's and YS's enrollment at ECFS for the 2021-2022 Academic Year" and "the 2022-2023 Academic Year." (Mem. at 7.) The Movant Defendants make no colorable argument that Y.A. and Y.S. could not have voided the 2022-2023 Enrollment Contract on account of having accepted its benefits, as neither child attended ECFS for any part of that school year. That means that at least Y.S.'s claims arising from her expulsion in September 2022 are governed by an agreement that she, as a minor, was permitted to void.[8]

That leaves Y.A.'s and Y.S.'s claims arising during or before the 2021-2022 school year. True, the minors attended all (or, in Y.A.'s case, almost all) of the school year. But, as a substantive matter, the fact that both parties to a contract have completed performance does not prevent a minor from voiding it, though at that point, if the minor "reaped a benefit, he must return it or its value." *Joseph v. Schatzkin*, 259 N.Y. 241, 243-44 (1932). For example, in *Kamil v. New York College of Dentistry*, the First Department held that a minor could void a contract executed between himself and a dentistry school for tuition in exchange for lessons when he had only attended three days of lessons, and that if he had attended more, "he would have had to

---

[8] Though the parties do not discuss it in briefing, the 2021-22 and 2022-23 enrollment contracts' arbitration provisions appear to differ in scope. The 2021-2022 Enrollment Contract requires arbitration of "any dispute . . . relating to or concerning this Contract or breach thereof" (2021-22 Enrollment Contract at 6), and the 2022-23 Enrollment Contract requires arbitration of "any dispute . . . of any nature regarding any aspect of the Parents' or the Student's relationship with the school" (2022-23 Enrollment Contract at 7).

account therefor."  168 N.Y.S. 527, 528 (1st Dep't 1918).  Of course, there are cases where such

an accounting is impossible, such as in *Mutual Milk & Cream Co. v. Prigge*, in which the First

Department upheld the enforcement of a restrictive covenant contained within an employment

contract voided by a minor because the minor could not "surrender to the plaintiff the knowledge

he acquired while in its employ concerning its customers and his acquaintance with them, which

doubtless enable[d] him to receive greater compensation from a rival dealer."  98 N.Y.S. 458,

459 (1st Dep't 1906); *see also Scott Eden Mgmt. v. Kavovit*, 563 N.Y.S.2d 1001, 1003-04 (N.Y.

Sup. Ct. 1990) (applying *Mutual Milk*).  But *Mutual Milk*'s rule—treating trade secrets and

customer relationships obtained by virtue of employment as benefits accrued to a minor—is

inapplicable to the arbitration clauses at issue, which no one argues afforded Plaintiffs

unreturnable benefits akin to trade secrets.  *See Adamoswki v. Curtiss-Wright Flying Serv.*, 300

Mass. 281, 284-85 (1938) (holding that, as an unsettled matter of New York law, *Mutual Milk*

does not preclude a minor "from disaffirming the contract and recovering the consideration that

he paid, by the fact that he cannot return the instruction received").[9]  And more broadly, New

York law does not require, contrary to the Movant Defendants' suggestion, that once a minor

receives any benefit from a contract she may no longer repudiate it.  *See CBS, Inc. (CBS Recs.*

---

[9] The Court is aware of no case concerning, and the parties do not discuss, whether the presence of an arbitration clause in a contract otherwise voidable by a minor lowers the contract price sufficiently to require its enforcement against the minor (or a greater repayment of benefits than would be owed if not for the arbitration clause).  *Cf. Doe #1*, 440 F. Supp. 3d at 355-56 (not reaching the issue of whether a minor voided an entire contract containing an arbitration provision because the minor plaintiff challenged only the arbitration provision, rather than disaffirming the entire agreement).  In general, the mere inability to return contract benefits is insufficient to require enforcement under *Mutual Milk* unless the minor has the ability to continue using those benefits to the detriment of the other contracting party.  *Cf. Adamowski*, 300 Mass. at 285 (refusing to extend *Mutual Milk* simply because a minor obtained an "intangible benefit").  But because the burden of establishing that a contract must be enforced because the minor has retained benefits from the agreement that are impossible to return falls to the Movant Defendants, who have not made such a showing, the Court need not reach this issue.

*Div.) v. Tucker*, 412 F. Supp. 1222, 1226 n.6 (S.D.N.Y. 1976) ("The clear implication of [*Joseph*, 259 N.Y. at 244-45], in this Court's view, is that, had a benefit been received, its value would have been deducted from the consideration recovered by the infant; not that disaffirmance would not have been allowed. This Court is unable to conclude that New York law precludes an infant from disaffirming a contract, made during infancy, simply because the contract has been of benefit to the infant."). Because Y.A. and Y.S. purport to disaffirm their enrollment contracts, *see Kaufman v. Am. Youth Hostels, Inc.*, 174 N.Y.S.2d 580, 589 (Sup. Ct. Westchester Cnty. 1957), *aff'd as modified in other respects*, 177 N.Y.S.2d 587 (2d Dep't 1958) (deeming the commencement of litigation to constitute disaffirmance of a covenant not to sue executed by a minor), and the Movant Defendants have not made a showing that Plaintiffs have sought to enforce those contracts, executed them for necessaries, or are bound to them for some other reason, no enforceable arbitration agreement prevents Y.A. and Y.S. from pursuing their claims in court.[10] The motion to compel them to arbitrate is therefore denied.

However, even though Y.A. and Y.S. may disaffirm their enrollment contracts as minors, Melendez may not. *Haynes v. Quality Mkts.*, No. 02-CV-250, 2006 WL 8455663, at *7

---

[10] Much of the discussion is clouded by the parties' references to cases concerning C.P.L.R. Section 1209, which generally prohibits the arbitration of disputes involving a minor unless the minor's representative obtains a court order permitting such an arbitration. *See Cutway v. S.T.A.R. Programs, Inc.*, 904 N.Y.S.2d 806, 812 (3d Dep't 2010). In such a case, parents cannot prevent arbitration simply by refusing to pursue Section 1209 orders, but must instead apply for an order and raise their objections to arbitration therein. *See id.* at 813. As Plaintiffs correctly point out, that does not govern the situation where minors have voided a contract containing an arbitration provision. *See Manhattan Cryobank, Inc. v. Hensley*, No. 19-CV-3370, 2020 WL 4605236, at *4 n.2 (S.D.N.Y. Aug. 11, 2020) (explaining the precise posture of *Cutway*'s analysis of Section 1209). And Section 1209 should not be read to imply a broad prohibition on a minor's disaffirmance of contracts containing arbitration provisions, because "[w]here the legislature has determined in particular instances to limit or deny an infant the right of disaffirmance, it has invariably done so in explicit terms." *Shields v. Gross*, 451 N.Y.S.2d 419, 420 (1st Dep't 1982).

(W.D.N.Y. Mar. 2, 2006) (Scott, Mag. J.), *report and recommendation adopted*, 2006 WL

8455678 (W.D.N.Y. Mar. 30, 2006), *aff'd*, 307 F. App'x 473 (2d Cir. 2008) (summary order)

("The right to avoid or disaffirm a contract is personal to the infant alone."); *accord NYC Mgmt.*

*Grp., Inc. v. Brown-Miller*, No. 03-CV-2617, 2004 WL 1087784, at *5 (S.D.N.Y. May 14, 2004)

("[U]nder California law [and the law of several other jurisdictions], if both the minor and the

parent sign a contract under which both are contractually bound to perform, the minor may

disaffirm without affecting the parent's contractual obligation.").  Melendez does not explain

why she should be able to share in Y.A.'s and Y.S.'s rights as minors to disaffirm their contracts.

Because Plaintiffs raise no other challenge to the validity of the enrollment contracts, they—and

their arbitration and delegation provisions—exist with respect to Melendez.

### 2.    Waiver by Litigation

Melendez argues next that the Movant Defendants have waived their right to compel

arbitration by litigating this case in court in violation of the enrollment contracts' arbitration

provisions.  (Opp. at 14-15.)  As with the question of whether a minor has voided a contract, the

Court, rather than an arbitrator, is to decide whether a party has waived its right to arbitration

through their litigation conduct.[11]  *See Alvarez v. Experian Info. Sols., Inc.*, 661 F. Supp. 3d 18,

28 (E.D.N.Y. 2023) (differentiating general waiver, which is to be decided by an arbitrator, from

---

[11] And like with the determination of whether Y.A. and Y.S. voided the enrollment contracts, the Court must assess whether the Movant Defendants waived their right to arbitrate, even though the enrollment contracts contain delegation provisions.  (*Cf.* Mem. at 10.)  That is sensible always, as a defendant's waiver of its right to arbitrate would also, *a fortiori*, constitute a waiver of its right to delegate, which permits even less litigation.  And it is especially sensible in this case, given the Supreme Court's insistence that parties evince a "clear and unmistakable" intent to delegate particular issues of arbitrability.  *Cf. Pacelli v. Augustus Intel., Inc.*, 459 F. Supp. 3d 597, 615 n.10 (S.D.N.Y. 2020) ("[T]he parties' delegation agreement provides no evidence—let alone the 'clear and unmistakable' evidence that is required—to suggest that the parties intended to delegate the litigation-conduct waiver question to an arbitrator." (citation omitted)).

waiver of the particular right to arbitrate by litigating).[12]  The Court is to treat a purported waiver of the right to arbitration in the same manner as a waiver of any other contractual right.  *See Morgan*, 596 U.S. at 417 ("[T]he FAA's 'policy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring procedural rules.").  However, the Supreme Court recently declined to fashion a federal waiver-by-litigation test for itself, leaving that task to the lower courts and passing upon the Eighth Circuit's formulation only to rebuke its arbitration-specific requirement of a showing of prejudice.  *See Morgan*, 596 U.S. at 419.  The Second Circuit has yet to publish a decision on the issue.  *See Xiahong v. Dingledine*, No. 23-CV-11094, 2025 WL 1604001, at *4-5 (S.D.N.Y. June 6, 2025) (Tarnofsky, Mag. J.).

Without binding precedent imposing a post-*Morgan* waiver rule, "district courts in the Second Circuit assessing waiver-of-arbitration have taken varying approaches."  *WCW, Inc. v. Atlantis Indus., Inc.*, 698 F. Supp. 3d 708, 748 (D. Vt. 2023) (collecting cases).  That said, in a summary order, the Second Circuit described the post-*Morgan* analysis as asking "whether a party knowingly relinquished the right to arbitrate by acting inconsistently with that right." *Brown v. Peregrine Enters., Inc.*, No. 22-2959, 2023 WL 8800728, at *3 (2d Cir. Dec. 20, 2023) (summary order) (cleaned up).  To answer that question, courts often consider "the time elapsed from when litigation was commenced until the request for arbitration" and "the amount of litigation to date, including motion practice and discovery."  *See Boustead Sec., LLC v. Leaping*

---

[12] *Alvarez* and *Pacelli v. Augustus Intelligence, Inc.*, 459 F. Supp. 3d 597, 613 (S.D.N.Y. 2020) explain the court-decides-waiver-by-litigation rule by virtue of courts' "peculiar expertise—not necessarily shared by arbitrators" in determining whether a parties' litigation conduct validly waived its contractual right to arbitrate.  *Cf. Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-86.  Another way to explain the rule is that waiver of arbitration through litigation constitutes the invalidation of a particular right—to arbitrate—rather than of the entire contract in which the arbitration provision is found.  So framed, waiver by litigation is a challenge to an arbitration provision itself and thus, under *Buckeye*, for a court to decide.

*Grp. Co., Ltd.*, 656 F. Supp. 3d 447, 451 (S.D.N.Y. 2023). "Delay alone does not establish waiver." *Levy v. Credit Plus, Inc.*, No. 21-CV-5541, 2023 WL 2644352, at *11 (S.D.N.Y. Mar. 27, 2023) (cleaned up).

The Court need not determine the precise formulation of the waiver-by-litigation test, though, because the Movant Defendants' conduct falls far short of anything resembling acting inconsistently with their right to arbitrate. Melendez argues in particular that the Movant Defendants' attempts to settle the case, both before and after it was filed, constitute a waiver of their right to pursue arbitration. (*See* Opp. at 14-15.) But attempting to amicably resolve a dispute is not inconsistent with pursuing, once those efforts fail, arbitration rather than litigation. Melendez cites no authority to the contrary. Moreover, no significant motion practice has taken place in this case, which was stayed pending settlement efforts until the Movant Defendants in October 2024 proposed a briefing schedule regarding their intended motion to compel arbitration. (*See* ECF No. 34.) Even though eighteen months passed between the commencement of the litigation and the filing of the motion to compel arbitration, at no point have the Movant Defendants evinced an intent for the Court, rather than arbitrator, to adjudicate the merits of the case. "Thus, while the length of time elapsed between the filing of this case and [the Movant] Defendants' request to arbitrate weighs somewhat in favor of a finding of waiver, the parties have not engaged in any meaningful amounts of litigation to date," and accordingly, "the Court concludes that [the Movant] Defendants have not waived their right to arbitrate under the Second Circuit's analysis for waivers of the right to arbitrate." *Herrera v. Manna 2nd Ave. LLC*, No. 20-CV-11026, 2022 WL 2819072, at *10 (S.D.N.Y. July 18, 2022).

### D.    Enforceability of the Arbitration Provisions

All that remains to be decided are Melendez's challenges to the enforceability of the enrollment contracts' arbitration provisions. Two peculiarities of federal arbitration law are

20

relevant at the outset.  First, though Melendez may at some point raise challenges to the enforceability of the entirety of the enrollment contracts, she is confined now to challenging only the agreements' arbitration provisions directly.  *Rent-A-Center*, 561 U.S. at 70-71.  Second, though Melendez may invoke state law (in this case, New York's) to challenge the enrollment contract's arbitration provisions, that law may not treat agreements to arbitrate less favorably than other types of contracts.  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  The latter principle takes off the table Melendez's arguments that New York law prohibits agreements to arbitrate particular types of disputes, which Melendez concedes are preempted by the FAA so long as it applies to the agreements in question.  (*See* Opp. at 13-14.)  Because the Court concludes that the FAA does govern the enforcement of the enrollment contracts, *see supra* Section III.A, it may not apply any New York law that selectively disfavors arbitration.

Still, Melendez charges that the specific arbitration provisions contained in the enrollment contracts are unenforceable because they conflict with her federal statutory rights and violate New York's generally applicable unconscionability doctrine.  (*See* Opp. at 6-11.)

### 1.      Melendez's Statutory Rights

First, Melendez argues that the arbitration provisions vitiate her statutory rights as a civil-rights plaintiff to attorney's fees and costs under 42 U.S.C. § 1988 and similar provisions under New York law.[13]  (*See* Opp. at 6-7.)  As Melendez notes in her opposition, the enrollment contracts' arbitration provisions differ on the subject of fees and costs:  The 2021-22 Enrollment Contract selects the AAA's Commercial Arbitration Rules (*see* 2021-22 Enrollment Contract at

---

[13] Melendez also makes a passing reference to the fact that the arbitration provisions operate as waivers to her rights to a public forum and a jury under the federal and New York constitutions.  (Opp. at 7.)  The enforceability of such provisions is a necessary component of arbitration and well-settled under the FAA.  *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 126 (2d Cir. 2010) (collecting Supreme Court cases).

6; ECF No. 47-1), while the 2022-23 Enrollment Contract selects the AAA's Consumer

Arbitration Rules (*see* 2022-23 Enrollment Contract at 7; ECF No. 47-2 (incorrectly labeled

"AAA *Commercial* Rules" on the electronic docket)).  Both sets of rules scale costs according to

the value of the claim asserted; the commercial rules impose an initial filing fee of $7,700 for

claims of undetermined value (ECF No. 47-1), while the consumer rules impose an initial filing

fee of $225 for all claims (ECF No. 47-2).  Under the commercial rules, the arbitrator is

permitted to allocate administrative costs (including the arbitrator's hourly rate) as part of its

final award; under the consumer rules, the business is responsible for those costs regardless of

which party initiates the arbitration.  (*See* ECF Nos. 45-1, 45-2.)  As for attorney's fees, the

2021-22 Enrollment Contract separately provides for each party bearing its own "costs and

expenses" (*see* 2021-22 Enrollment Contract at 7), which Melendez takes to refer to attorney's

fees (*see* Opp. at 7).  The 2022-23 Enrollment Contract is silent on the question of attorney's

fees and omits the "costs and expenses" term.  (*See* 2022-23 Enrollment Contract at 7-8.)

　　　The Supreme Court has made clear that "statutory claims may be the subject of an

arbitration agreement, enforceable pursuant to the FAA."  *Gilmer v. Interstate/Johnson Lane*

*Corp.*, 500 U.S. 20, 26 (1991).  However, "[b]y agreeing to arbitrate a statutory claim, a party

does not forgo the substantive rights afforded by the statute; it only submits to their resolution in

an arbitral, rather than a judicial, forum."  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,*

*Inc.*, 473 U.S. 614, 628 (1985).  But interpretation and application of a particular arbitral forum's

procedures are typically reserved for the arbitrator, rather than a court.  *See Howsam*, 537 U.S. at

84-85.  And where it is not clear that the text of the arbitration provisions would compel

limitations on available remedies to unduly burden statutory rights, the Supreme Court has left

the determination of available remedies—consistent with both the FAA and applicable federal

statutes—to the arbitrator. *PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 405-07 (2003) ("[S]ince we do not know how the arbitrator will construe the remedial limitations, the questions whether they render the parties' agreements unenforceable and whether it is for courts or arbitrators to decide enforceability in the first instance are unusually abstract."). On the other hand, the Second Circuit has suggested that arbitration fee structures that conflict with statutory rights are void. *See Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 125-26 (2d Cir. 2010). And as even the Movant Defendants concede, where such a conflict emerges, the proper remedy is typically severance of the offending fee provisions and enforcement of the remainder of the agreement to arbitrate. *See Herrera v. Katz Commc'ns*, 532 F. Supp. 2d 644, 647 S.D.N.Y. 2008); *see also DeGaetano v. Smith Barney, Inc.*, 983 F. Supp. 459, 468 (S.D.N.Y. 1997) (vacating an arbitrator's denial of attorney's fees for unduly burdening a Title VII plaintiff's statutory rights). That is consistent, too, with New York contract law providing for the severance of discretely unenforceable contract provisions. *See Yost v. Everyrealm, Inc.*, No. 22-CV-6549, 2023 WL 2859160, at *10 (S.D.N.Y. Apr. 10, 2023) (collecting cases).

At this stage, it is not clear that either enrollment contract will be applied by an arbitrator to interfere with Melendez's purported statutory rights. Neither agreement unambiguously limits the arbitrator's power to award attorney's fees. *Cf. Ragone*, 595 F.3d at 123-24 (affirming the enforcement of an arbitration agreement, applied to claims for which statutes permit prevailing plaintiffs to recover attorney's fees, where defendants waived a mandatory prevailing-party fee-shifting arbitration provision). Nor is it clear that Melendez will be required to pay the larger commercial, rather than consumer, filing fee, especially because the enrollment contracts' arbitration provisions differ in scope, *see supra* note 8. Those uncertainties are compounded by the lack of briefing on the subject, with Melendez barely parsing the relevant agreements' fee

structures or citing case law relevant to those structures' impact on her statutory rights. *Cf. Green Tree Fin. Corp.-Al. v. Randolph*, 531 U.S. 79, 90-91 (2000) (reversing a determination that an arbitration clause's silence as to costs and fees rendered it unenforceable as a burden on the plaintiff's statutory rights where the record contained "hardly any information on the matter"). In such a circumstance, the Supreme Court has instructed that a court "should not, on the basis of 'mere speculation' that an arbitrator might interpret these ambiguous agreements in a manner that casts their enforceability into doubt, take upon [itself] the authority to decide the antecedent question of how the ambiguity is to be resolved." *PacifiCare*, 538 U.S. at 406-06 (citing *Vimar Seguros Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 541 (1995)). Melendez, seeking "to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive," "bears the burden of showing the likelihood of incurring such costs." *Randolph*, 531 U.S. at 92. She has not done so.

### 2.    Unconscionability Under New York Law

Melendez argues finally that the enrollment contracts' arbitration provisions are unconscionable under New York law because the contracts were offered "on a take-it-or-leave-it basis" when Y.A. and Y.S. were already students at ECFS, and because the provisions substantially favor the Movant Defendants "by including a waiver of a public forum, a jury trial right, the right to recover litigation costs and expenses, including legal fees, and the right of collective action." (Opp. at 9-11.) "Under New York law, a contract is unconscionable when it is 'so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable accordingly to its literal terms." *Ragone*, 595 F.3d at 121 (quoting *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009)) (insertion omitted). "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made." *Gillman v.*

*Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988). At the outset, Melendez's argument "that she was offered the arbitration agreement on a take it or leave it basis" "is not sufficient under New York law to render the arbitration provision procedurally unconscionable." *Ragone*, 595 F.3d at 122 (cleaned up); *see also Hu v. Barclays*, No. 24-CV-7580, 2025 WL 1307700, at *3 (S.D.N.Y. May 6, 2025) ("[I]t is settled law in New York that an agreement to exchange continued employment for a commitment to arbitrate is enforceable."). And though her arguments about the bargaining power between the parties—particularly in light of the fact that declining the enrollment contracts would have required pulling her children out of their schools—may move the needle on procedural unconscionability, nothing about the agreements is substantively unconscionable. As already explained, Melendez's arguments regarding the fee structures and allocation of attorney's fees are premature. And the deprivation of a jury and public forum are ordinary aspects of bilateral arbitration, which is heavily favored by the FAA. *See Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 126 (2d Cir. 2010). Finally, Melendez's argument—tucked away in half a sentence without a citation—that the class waivers are substantively unconscionable does not change the analysis, as such provisions are permitted under New York law. *See, e.g.*, *Pilon*, 769 F. Supp. 3d at 273 ("Petitioners' argument that the agreement here is substantively unconscionable under California's anti-class-arbitration-waiver rule is irrelevant, since New York law governs the enforceability of the [agreement] and contains no such rule."). Accordingly, the Court holds that neither enrollment contract's arbitration provisions are unconscionable and that they may be enforced to compel Melendez to arbitrate.

## III.    Conclusion

For the foregoing reasons, the Movant Defendants' motion to compel arbitration is DENIED as to Y.A. and Y.S. and GRANTED as to Melendez.

The parties are directed to confer and file a joint status letter, within 21 days of the publication of this Opinion and Order, proposing further proceedings.

The Clerk of Court is directed to close the motions at ECF Nos. 13 and 37.

SO ORDERED.

Dated: June 27, 2025
New York, New York

_____
J. PAUL OETKEN
United States District Judge