UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CRISTINA MELENDEZ, Y.A., and Y.S.,

Plaintiffs,

v.

ETHICAL CULTURE FIELDSTON SCHOOL, JESSICA BAGBY, KENNY GRAVES, STEPHANIE WEBER, JOE ALGRANT, and JOHN AND JANE DOES,

Defendants.

CIVIL ACTION NO.: 23 Civ. 4917 (JPO) (SLC)

**REPORT & RECOMMENDATION**[1]

**SARAH L. CAVE**, United States Magistrate Judge.

**TO THE HONORABLE J. PAUL OETKEN**, United States District Judge:

## I. INTRODUCTION

Plaintiff Cristina Melendez ("Ms. Melendez"), on behalf of herself and her daughters, Y.A. and Y.S. (together, "Plaintiffs"), former students at Defendant Ethical Culture Fieldston School ("ECFS"), asserts discrimination and retaliation claims under federal and state law against ECFS and four of its employees. (See generally Dkt. No. 4 (the "Complaint")). This action is one of several before the Honorable J. Paul Oetken in this District in which current and former students have asserted similar claims against ECFS. See, e.g., Emile v. Ethical Culture Fieldston Sch., No. 21 Civ. 3799 (JPO), 2023 WL 4763233 (S.D.N.Y. July 26, 2023) ("Emile I").

Ms. Melendez and her daughters were initially represented by Derek Sells, Esq. ("Sells") of The Cochran Firm ("TCF"), before they terminated and replaced him with Nathaniel B. Smith

[1] This Report and Recommendation was temporarily docketed under seal given the confidentiality designations in the parties' filings (Dkt. No. 101), but this public, redacted version, is now being docketed pursuant to the Court's September 22, 2026 Order granting in part and denying in part the parties' requested redactions. (Dkt. Nos. 103–04).

("Smith"),[2] the attorney who filed the Complaint and represented Plaintiffs through a series of conferences before the undersigned that eventually resulted in a settlement of their claims against ECFS (the "Settlement"). (Dkt. Nos. 18; 20; 30–31; 69; minute entries dated May 3, 2024, July 19, 2024, July 23, 2024, July 26, 2024, Aug. 9, 2024, Apr. 9, 2026).

Now before the Court are Plaintiffs' motion for an infant compromise order with respect to Y.S.'s claims (Dkt. No. 80 (the "Compromise Motion")), and (2) TCF's motion to enforce a charging lien of $63,630.00 (the "Proposed Lien") against the Settlement (Dkt. Nos. 84–84-10 (the "Lien Motion," with the Compromise Motion, the "Motions")), which Plaintiffs oppose. (Dkt. Nos. 86–86-4). ECFS supports the Compromise Motion and takes no position on the Lien Motion. (Dkt. No. 88). For the reasons set forth below, we respectfully recommend that the Compromise Motion be GRANTED and the Lien Motion be GRANTED IN PART and DENIED IN PART.

## II. BACKGROUND

### A. Factual Background

We incorporate by reference the factual background of the related ECFS actions set forth in decisions by Judge Oetken and the undersigned. See Wright v. Ethical Culture Fieldston Sch., No. 23 Civ. 1874 (JPO) (SLC), 2025 WL 2616578, at *1–3 (S.D.N.Y. July 15, 2025) ("Wright I"), adopted by, 2025 WL 2180448 (S.D.N.Y. Aug. 1, 2025) ("Wright II"); Melendez v. Ethical Culture Fieldston Sch., 789 F. Supp. 3d 316 (S.D.N.Y. 2025); Mason v. Ethical Culture Fieldston Sch., No. 23 Civ. 1402 (JPO) (SLC), 2025 WL 2336096, at *1–3 (S.D.N.Y. Jan. 24, 2025) ("Mason I"),

[2] John David Lenoir, another solo practitioner, has also appeared with Smith on behalf of Plaintiffs, although Smith appears to have the lead counsel role. (Dkt. No. 7). For simplicity, we refer to Smith and Lenoir together as Smith.

adopted by, 2025 WL 1862829 (S.D.N.Y. July 7, 2025) ("Mason II").[3] We discuss only the background necessary to analyze the Motions.

### 1. Plaintiffs' Allegations

Ms. Melendez,[4] a person of color, is the mother of Y.A. and Y.S., who are also people of color and formerly were students at ECFS. (Dkt. No. 4 ¶¶ 1–3). Y.A. attended ECFS from her kindergarten year in September 2012 until April 2022, before the end of her ninth-grade year, after Defendant Stephanie Weber falsely accused Y.A. of cheating. (Dkt. No. 4 ¶¶ 14–15). Y.S. attended ECFS from her pre-kindergarten year in September 2017 until ECFS "forced her to leave in September 2022." (Dkt. No. 4 ¶ 16). Plaintiffs' claims are based on the allegations that ECFS denied Y.A. and Y.S., and other students of color, "the same opportunities and benefits that were provided to white students[]" and "created a racially hostile environment at the school that persisted throughout the time that [Y.A.] and [Y.S.] attended ECFS." (Dkt. No. 4 ¶¶ 31, 36; see id. ¶¶ 32–33, 37–40, 48–51; see Dkt. No. 80-1 ¶ 4 (alleging that ECFS "failed to properly address ongoing racism" and "retaliated against [them] when [they] complained about the ongoing racism at the School")).

### 2. Plaintiffs' Retention of TCF

In April 2022, Ms. Melendez retained TCF to represent her and Y.A. (Dkt. No. 80-1 ¶ 5; see Dkt. Nos. 84-2 (the "TCF Retainer Agreement"); 84-4). The TCF Retainer Agreement provided that TCF would recover 40% of any settlement or judgment TCF "obtain[ed]" on Plaintiffs' behalf.

[3] Internal citations and quotation marks are omitted from case citations unless otherwise indicated.
[4] TCF sometimes refers to Ms. Melendez as "Dr. Melendez." (See, e.g., Dkt. No. 84 at 7–8). Because the record does not otherwise indicate her professional status and because Smith, her current counsel, refers to her as Ms. Melendez (see, e.g., Dkt. No. 86 at 6), we do the same.

(Dkt. No. 84-2 at 1 (the "Contingency Fee")). TCF drafted a 588-paragraph complaint on Plaintiffs' behalf. (Dkt. Nos. 84-3 (the "Draft Complaint"); 84-5). On behalf of Ms. Melendez and Y.A., TCF then wrote a letter to ECFS, shared the Draft Complaint, and attempted to settle their claims over the next few months. (Id.; see Dkt. Nos. 84-4 (text messages); 84-6 (TCF letter to ECFS)). In July 2022, ECFS communicated to Sells an offer to settle Plaintiffs' claims for [redacted] plus non-monetary terms, [redacted] (Dkt. Nos. 80-3 ¶ 6; 84-5 at 4). Sells responded that Ms. Melendez was "not willing to pull [Y.S.] from ECFS this upcoming school year for fear that it will negatively harm her emotional development." (Dkt. No. 84-5 at 3).

In August 2022, Ms. Melendez "rejected [the] proposed settlement[,]" which she felt Sells "pressure[ed]" her to accept, and then blocked his calls and terminated TCF's representation. (Dkt. No. 80-1 ¶ 5; see Dkt Nos. 80-3 ¶ 7; 84-4 at 27–34, 45–56).

**3. The Settlement**

On June 7, 2023, Ms. Melendez retained Smith in connection with the race discrimination and retaliation claims she sought to assert on behalf of herself and her daughters against ECFS. (Dkt. Nos. 80-1 ¶ 6; 100-1 (the "Smith Retainer Agreement")). Under the Smith Retainer Agreement, Smith is entitled to attorneys' fees in the amount of one-third of any recovery he obtains on Plaintiffs' behalf. (Dkt. Nos. 80-3 ¶ 14; 100-1 at 2).

On February 6, 2026, Plaintiffs and Defendants reached the Settlement, which they memorialized in a written agreement. (Dkt. No. 80-2 (the "Agreement")). The material terms of the Agreement include: (1) ECFS's payment of [redacted] (the "Settlement Payment");

[redacted] (Dkt. No. 80-3 ¶ 14).

In a declaration supporting the Compromise Motion, Ms. Melendez attests that she plans to set aside Y.S.'s share of the Settlement Payment "for her future benefit, including future college and/or postgraduate education." (Dkt. No. 80-1 ¶ 9).[5] Ms. Melendez acknowledges that Y.S.'s "claims for emotional stress caused by her expulsion" are "difficult to place a monetary value on." (Id. ¶ 10). Ms. Melendez believes the Settlement "is a reasonable and appropriate compromise" of Y.S.'s claims for emotional distress because, although Y.S. "has not had any long-term mental health issues and is a well-adjusted child[,]" continued litigation "would have potentially exposed [her] to further stress due to the unknown and uncertain events of litigation[.]" (Id.) Accordingly, Ms. Melendez believes that the Settlement "is a reasonable compromise that is also in YS's best interests." (Id.)

**B. Procedural Background**

On June 12, 2023, Plaintiffs filed the Complaint. (Dkt. No. 4). At the parties' request, the Honorable J. Paul Oetken referred this action to the undersigned for purposes of conducting a settlement conference. (Dkt. No. 16; see Dkt. No. 15). During the summer of 2024, the Court held several in person and telephone conferences with the parties regarding settlement, without

[5] We presume Ms. Melendez's reference to "YA" in this paragraph is a typographical error and that she meant to refer to Y.S., her younger daughter whose claims are the subject of the Compromise Motion. (Dkt. No. 80-1 ¶ 9; see id. ¶ 2 (noting that Y.S. was born in 2003 and is 13 years old).

success. (Dkt. Nos. 18; 20; 30; 31; minute entries dated May 3, 2024, July 19, 2024, July 23, 2024, July 26, 2024, Aug. 9, 2024).

On June 27, 2025, Judge Oetken granted Defendants' motion to compel Ms. Melendez to arbitrate her claims, but denied the motion as to Y.S. and Y.A. (Dkt. No. 48). See Melendez, 789 F. Supp. 3d at 337. Plaintiffs appealed (Dkt. Nos. 53; 58), and during the pendency of the appeal, the parties participated in additional mediation sessions, which resulted in the Settlement. (Dkt. Nos. 59-60; 62; 67; 69; 80-3 ¶ 11). Following a conference on April 9, 2026 (Dkt. No. 73; minute entry Apr. 9, 2026), the Court set a briefing schedule for the Motions. (Dkt. No. 76).

On April 16, 2026, Plaintiffs filed the Compromise Motion, which they support with declarations from Ms. Melendez and Smith. (Dkt. Nos. 78–81). On April 24, 2026, TCF filed the Lien Motion, (Dkt. Nos. 84 – 84-10), which Plaintiffs opposed. (Dkt. Nos. 86–86-4). On May 8, 2026, TCF filed a reply in further support of the Lien Motion. (Dkt. Nos. 91–91-2).

After reviewing the Motions, the Court found that there was good cause to forego a hearing on the Compromise Motion, but granted TCF's request for a hearing concerning the Lien Motion and directed Plaintiffs to file a copy of the Smith Retainer Agreement. (Dkt. No. 97). TCF subsequently notified the Court that it "withdr[ew] its request for a hearing" and asked the Court to decide the Lien Motion on the submitted record, so the Court cancelled the hearing. (Dkt. No. 99). On August 25, 2026, Plaintiffs submitted the Smith Retainer Agreement. (Dkt. No. 100 – 100-1).

## III. DISCUSSION

### A. The Compromise Motion

Plaintiffs seek approval of the Settlement with respect to Y.S., as well as approval to pay attorneys' fees to Smith and TCF out of the Settlement Payment. (Dkt. Nos. 78; 80-3 ¶ 14).

#### 1. Legal Standard

"Local Civil Rule 83.2(a)(1) requires parties to obtain court approval before settling claims by or on behalf of a minor." A.F.N. v. United States, No. 22 Civ. 8075 (PAE), 2024 WL 3634793, at *2 (S.D.N.Y. Aug. 2, 2024). To determine whether to approve such an "infant compromise," the court reviewing the settlement "must conform, as much as possible, to the New York State statutes and rules[.]" Loc. Civ. R. 83.2(a)(1). Under New York law, a court reviewing an infant compromise inquires "whether (1) the proposed settlement is in the infant's best interests; and (2) the proposed attorneys' fees and costs are reasonable." D.J. ex rel. Roberts v. City of New York, No. 11 Civ. 5458 (JGK) (DF), 2012 WL 5431034, at *2 (S.D.N.Y. Oct. 16, 2012), adopted sub nom., Roberts v. City of New York, 2012 WL 5429521 (S.D.N.Y. Nov. 7, 2012); see N.Y. Jud. L. § 474; N.Y. C.P.L.R. §§ 1205–1208.

The infant plaintiff's guardian must make the motion, see N.Y. C.P.L.R. § 1207, and must support it with affidavits from the guardian and from counsel setting forth the information

required in N.Y. C.P.L.R. § 1208(a)[6] and (b)[7] as well as medical or hospital reports where the action involves a personal injury claim. In addition, the moving party, the infant, and his or her attorney must appear "before the court unless attendance is excused for good cause." N.Y. C.P.L.R. § 1208(d).

#### 2. Application

##### a. Fairness of the Settlement Payment

###### i. Legal Standard

"There is no bright-line test for determining whether a proposed settlement is in the infant's best interest." A.F.N., 2024 WL 3634793, at *2. The Court assesses whether the Settlement is "fair reasonable, and adequate by comparing the terms of the compromise with the likely rewards of litigation." Everett v. Bazilme, No. 06 Civ. 269 (SJ) (JO), 2007 WL 1876591, at *2 (E.D.N.Y. June 28, 2007). "There is a strong presumption that a settlement is fair and reasonable where (i) the settlement is not collusive but was reached after arm's length negotiations; (ii) the proponents have counsel experienced in similar cases; and (iii) there has been sufficient discovery to enable counsel to act intelligently." A.F.N., 2024 WL 3634793, at *2.

---

[6] The guardian's affidavit must include: (1) name, residence, and relationship to the infant; (2) name, age, and residence of the infant; (3) the circumstances giving rise to the claim; (4) the nature and extent of the infant's injuries, and if the action is for personal injuries, the name of each physician who treated the infant, medical expenses, period of disability, wages lost, and present physical condition; (5) terms and proposed distribution of the settlement and whether the guardian approves; (6) the facts surrounding any related actions based on the same claim; (7) whether reimbursement for medical or other expenses has been received from another source; and (8) whether the guardian or any member of the infant's family has made a claim for damages as a result of the same occurrence, and if so, the amount to be paid in settlement of such claim. N.Y. C.P.L.R. § 1208(a).

[7] The attorney's affidavit must state: (1) the reasons for recommending the settlement; (2) that the attorney does not have any interest adverse to the infant and whether the attorney represents any other person asserting a claim arising from the same occurrence; and (3) the legal services rendered. N.Y. C.P.L.R. § 1208(b).

Other factors the Court may consider include "the complexity, expense, and likely duration of litigation . . . [and] the risks of establishing both liability and damages[.]" D.J. ex rel. Roberts, 2012 WL 5431034, at *3. "Finally, courts afford significant deference to a guardian's view that the settlement reached is fair and reasonable to the infant plaintiff." A.F.N., 2024 WL 3634793, at *2.

### ii. Application

Viewing the Settlement against this standard, we find it fair, reasonable, and in Y.S.'s best interests.[8] First, the parties reached the Settlement after extensive arm's length negotiations before the undersigned and before the Second Circuit mediators, and we see no evidence of collusion in that process. (Dkt. Nos. 18; 20; 30–31; 59–60; 62; 67; 69; 80-3 ¶ 11; minute entries dated May 3, 2024, July 19, 2024, July 23, 2024, July 26, 2024, Aug. 9, 2024). Second, Smith has over 30 years of litigation experience, including representing other families in civil rights litigation involving ECFS. See Wright I, 2025 WL 2616578, at *1; Mason I, 2025 WL 2336096, at *1. Third, while the parties had not yet conducted any formal discovery in this action, the Complaint and Plaintiffs' submissions demonstrate that, before the settlement negotiations, Smith had investigated Plaintiffs' allegations, reviewed some documentary evidence, and assessed the strengths and weaknesses of Plaintiffs' claims and injuries. (Dkt. Nos. 4; 80-3 ¶¶ 2–4, 11–12). Finally, we observe that Ms. Melendez expressed the view that the Settlement is in Y.S.'s best interests. (Dkt. No. 80-1 ¶ 9). Balancing "the uncertain prospects and added expense of continued litigation" against the substantial monetary recovery under the Settlement, we find

[8] As a procedural matter, the Compromise Motion meets the requirements of N.Y. C.P.L.R. §§ 1207 and 1208, as Plaintiffs have provided declarations from both Ms. Melendez and Smith that contain the information required by § 1208(a) and (b), respectively. (Dkt. Nos. 78-1; 78-3).

that the Settlement "provides a recovery to [Y.S.] that is fair, reasonable, and adequate." C.G. by Gonzalez v. Dep't of Educ. of City of N.Y., No. 24 Civ. 3827 (SDA), 2025 WL 1078896, at *2 (S.D.N.Y. Apr. 10, 2025) (approving infant compromise).

**b. Reasonableness of Attorneys' Fees**

**i. Legal Standard**

Under New York Judiciary Law § 474, the appropriateness of an attorneys' fee request as part of an infant compromise turns on whether it is "suitable compensation for the attorney for his service on behalf of the said infant." Allstate Ins. Co. v. Williams, No. 04 Civ. 4575 (CLP), 2006 WL 2711538, at *4 (E.D.N.Y. Sept. 21, 2006) (citation modified). "[T]he Court has an independent obligation to scrutinize the appropriateness of counsel's requested compensation, so as to protect the interests of the infant client." D.J. ex rel. Roberts, 2012 WL 5431034, at *3; see Local Civ. R. 83.2(a)(2)). Therefore, courts treat contingency-fee arrangements as "advisory only" and as just one of the factors to consider in determining the reasonableness of the attorneys' fees request. A.F.N., 2024 WL 3634793, at *4.

As with other attorneys' fees requests, courts begin with the lodestar, "the product of a reasonable hourly rate and the reasonable number of hours required by the case." Campbell v. City of New York, No. 15 Civ. 2088 (PAE), 2015 WL 7019831, at *4 (S.D.N.Y. Nov. 10, 2015) (citation modified). To determine the hourly rate, a court considers "what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr., 652 F.3d 277, 289 (2d Cir. 2011). In addition, the Second Circuit has a "forum rule" requiring the use of "hourly rates employed in the district in which the reviewing court sits

in calculating the presumptively reasonable fee." Id. at 290. The determination of the reasonable hourly rate is aided by the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984). The Court may adjust base hourly rates to account for case specific variables such as the complexity of the issues, the amount involved and the benefit to the infant plaintiff, results obtained, and attorneys' experiences. See C.G., 2025 WL 1078896, at *3.

To determine the reasonable number of hours worked for the lodestar calculation, we must strike a balance "between principles of thoroughness and efficiency." LCS Grp. LLC v. Shire LLC, 383 F. Supp. 3d 274, 280 (S.D.N.Y. 2019). We examine the amount of time spent on each task and decide "how much of that time was reasonably expended given the scope and complexity of the litigation." Pichardo v. C.R. Bard, Inc., No. 09 Civ. 7653 (SHS), 2015 WL 13784565, at *4 (S.D.N.Y. Jan. 26, 2015). We also consider the number of attorneys involved. Tessemae's LLC v. Atlantis Capital LLC, No. 18 Civ. 4902 (KHP), 2019 WL 2635956, at *5 (S.D.N.Y. Jun. 27, 2019). We may rely on our "own familiarity with the case, as well as its experience with the parties' evidentiary submissions and arguments." Kreisler v. Second Ave. Diner Corp., No. 10 Civ. 7592 (RJS), 2013 WL 3965247, at *3 (S.D.N.Y. Jul. 31, 2013). A court may reduce the hours spent on the litigation to exclude excessive, redundant, or otherwise unnecessary time. Kirsch v. Fleet St., Ltd., 148 F.3d 149, 173 (2d Cir. 1998) (citing Hensley, 461 U.S. at 434); see LCS Grp. LLC, 383 F. Supp. 3d at 281 ("A court may apply an across-the-board reduction to effectuate the reasonable imposition of fees."); MSC Mediterranean Shipping Co. Holding S.A., No. 16 Civ. 8103 (LGS), 2017 WL 1194372, at *3 (S.D.N.Y. Mar. 30, 2017) (reducing fees for an unopposed motion for default judgment in a breach of contract case; excluding a

senior partner's time because "the matter did not warrant the involvement of two senior partners"; and cutting paralegal's time in half); see also Pichardo, 2015 WL 13784565, at *7 (reducing attorneys' hours by forty percent because the recorded time addressed only one relevant issue).

**ii. Application**

Smith seeks an award of one-third of the Settlement Amount but acknowledges that TCF's Proposed Lien "would come out of the one-third legal fee[]" he receives. (Dkt. No. 80-3 ¶ 14). We therefore interpret Smith to be seeking an award of [redacted] ("Smith's Requested Fees").[9] Smith represents that he and Lenoir have recently been awarded hourly rates of $575 and $550, respectively, and that he expended about 180 hours on Plaintiffs' matter, while Lenoir has expended about 60 hours. (Dkt. No. 80-3 ¶ 15). We therefore calculate the lodestar to be [redacted], which is just over [redacted] of Smith's Requested Fees.[10]

After considering the Smith Retainer Letter and the factors outlined above, we find that a modest reduction of 5% to Smith's Requested Fees is warranted. As an initial matter, Smith is undoubtedly aware of "the longstanding rule in the Second Circuit [that] applications for attorneys' fees must 'normally be disallowed unless accompanied by contemporaneous time records.'" R.G. v. Federated Inc., No. 14 Civ. 7734 (RJS), 2016 WL 3072396, at *2 (S.D.N.Y. May 27, 2016) (quoting N.Y. Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1154 (2d Cir. 1983). As a result, some New York courts have awarded less than the total requested fees "where adequate contemporaneous records have not been kept[.]" F.H. Krear & Co. v.

---

9 [redacted]

10 [redacted]

Nineteen Named Trustees, 810 F.2d 1250, 1265 (2d Cir. 1987). In infant compromise cases, some courts have reduced contingency fees "by 30% where adequate contemporaneous time records are lacking." R.G., 2016 WL 3072396, at *2 (collecting cases). While Smith has provided estimates of the number of hours he and Lenoir worked, he has not provided even reconstructed, let alone contemporaneous, time records. As the Honorable Richard J. Sullivan concluded in R.G., we find "that a 5% reduction sufficiently emphasizes the importance of contemporaneous time records to the Court's analysis, while still providing suitable compensation to [Smith] for his work on this case." 2016 WL 3072396, at *2.

As to the remaining factors, although Smith's Requested Fees are about twice the lodestar of [redacted], "[c]ours regularly award lodestar multipliers from 2 to 6 times lodestar" within the Second Circuit. Fleisher v. Phoenix Life Ins. Co., No. 11 Civ. 8405 (CM), et al., 2015 WL 10847814, at *18 (S.D.N.Y. Sept. 9, 2015) (collecting cases). In addition, we note that an attorneys' fees award that is one-third of the plaintiffs' total recovery "is typical in this Circuit." De Lancer v. Morgan Grp. LLC, No. 25 Civ. 6893 (VSB) (SDA), 2026 WL 1661422, at *4 (S.D.N.Y. June 8, 2026). Finally, Smith has explained several persuasive reasons why the amount he requests is appropriate, including his experience in similar cases, the risks and challenges of the litigation, the uncertain outcome of the Second Circuit appeal, and the favorable result for Y.S., who will have a substantial fund set aside for her future education. (Dkt. No. 80-3 ¶¶ 10–15). Accordingly, we find Smith's Requested Fees, after a 5% reduction to [redacted][11] to be reasonable. See C.G., 2025 WL 1078896, at *3 (approving one-third fee award in infant

[11] [redacted]

compromise proceeding); R.G., 2016 WL 3072396, at *3 (approving one-third fee award, less 5% reduction, in infant compromise proceeding).

* * *

Accordingly, we respectfully recommend that the Settlement be approved and that Smith be awarded fees in the amount of [redacted] ("Smith's Awarded Fees"). The difference between Smith's Requested Fees and Smith's Awarded Fees, [redacted],[12] would be allocated to Plaintiffs in any final order. See R.G., 2016 WL 3072396, at *3 (indicating that difference between requested fees and awarded fees would be allocated to infant plaintiff in separate settlement authorization order).

**B. The Lien Motion**

TCF does not seek the Contingency Fee but instead seeks to recover the Proposed Lien as "the reasonable value of the services it rendered to" Plaintiffs and to assert the Proposed Lien against the Settlement. (Dkt. No. 84-10 at 5). Plaintiffs argue that TCF is not entitled to any charging lien because Plaintiffs terminated TCF for cause and because TCF's time records contain billing misconduct and improper entries. (Dkt. No. 86). We now assess whether, and to what extent, TCF is entitled to any charging lien against the Settlement.

**1. Legal Standard**

A federal court "may, in its discretion, exercise ancillary jurisdiction to hear fee disputes . . . between litigants and their attorneys when the dispute relates to the main action[.]" Chesley v. Union Carbide Corp., 927 F.2d 60, 64 (2d Cir. 1991); see 28 U.S.C. § 1367. In an action such as this, involving a federal statute with a fee-shifting provision, "the matter of attorney's

[12] [redacted]

fees becomes part of an inextricable whole." Misek-Falkoff v. Int'l Bus. Mach. Corp., 829 F. Supp. 660, 663 (S.D.N.Y. 1993). Here, the Masons' claim under 42 U.S.C. § 1981 included a request to recover attorneys' fees. (ECF No. 4 at 16). See 42 U.S.C. § 1988(b).

Under New York law, a withdrawing attorney has "a charging lien against any recovery or settlement if the fee has not yet been paid for his [or her] services and disbursements . . . unless the [court] decides that the attorney withdrew without good and sufficient cause[.]" Misek-Falkoff, 829 F. Supp. at 663. New York Judiciary Law § 475 provides:

> From the commencement of an action, special or other proceeding in any court or before any state, municipal or federal department, except a department of labor, or the service of an answer containing a counterclaim . . . the attorney who appears for a party has a lien upon his or her client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, award, settlement, judgment or final order in his or her client's favor, and the proceeds thereof in whatever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment, final order or determination. The court upon the petition of the client or attorney may determine and enforce the lien.

N.Y. Jud. L. § 475. "[A]n attorney need not be counsel of record at the time a plaintiff receives judgment or settlement proceeds in order to have a lien on those proceeds, so long as the attorney was counsel of record at one point in the proceedings." Petition of Harley & Browne, 957 F. Supp. 44, 48 (S.D.N.Y. 1997). "[A]n attorney loses his right to enforce a charging lien if the attorney withdraws or is discharged for cause." Id. "A hearing is required to determine if [an attorney] was discharged for cause, and, if not, the amount of his fee on a quantum meruit basis[.]" Mason v. City of New York, 67 A.D.3d 475, 475 (1st Dep't 2009) (citing Teichner v. W & J Holsteins, Inc., 64 N.Y.2d 977, 978 (1985)).

Determining whether an attorney was discharged "for cause" requires an assessment as to whether "there has been a significant breach of legal duty." Allstate Ins. Co. v. Nandi, 258 F.

Supp. 2d 309, 312 (S.D.N.Y. 2003). The clients must show that their former attorney's conduct "constituted a failure to properly represent [their] interests[.]" Costello v. Kiaer, 278 A.D.2d 50, 50 (1st Dep't 2000); see Antonmarchi v. Consol. Edison Co. of N.Y., 678 F. Supp. 2d 235, 241 (S.D.N.Y. 2010) (concluding that former attorney provided "reasonable and necessary services" and did not "violate[ ] any legally or professionally imposed duty" to his client, and therefore, discharge was not for cause and charging lien was permitted); Casper v. Lew Lieberbaum & Co., No. 97 Civ. 3016 (JGK) (RLE), 1999 WL 335334, at *8 (S.D.N.Y. May 26, 1999); Campagnola v. Mulholland, Minion & Roe, 76 N.Y.2d 38, 44 (1990) ("Where the discharge is for cause, the attorney has no right to compensation or a retaining lien, notwithstanding a specific retainer agreement[.]"). New York courts are generally consistent in finding that an attorney has been dismissed "for cause" when one or more of the following were present:

> (1) the attorney's failure to perform under the employment contract; (2) his lack of diligence in so performing; (3) his lack of ordinary skill or care in so performing; (4) his making of demands on the client which violate the terms or exceed the scope of the contract; (5) his taking of actions contrary to the client's interests or objectives; (6) his indulging in some sort of unprofessional conduct while handling the client's affairs; (7) his venting of personal or economic hostility toward the client; and (8) his loss of the client's trust and confidence.

Chen v. LJC Trading N.Y., Inc., No. 19 Civ. 3276 (SJF) (AKT), 2020 WL 10574176, at *6 (E.D.N.Y. Nov. 20, 2020).

On a finding that the clients did not discharge the attorney for cause, the court may fix the amount of a charging lien "on a quantum meruit basis, ascertaining the reasonable value of the legal services rendered up to the date of" the termination. Sequa Corp. v. GBJ Corp., 156 F.3d 136, 148 (2d Cir. 1998).

2. **Application**

a. **TCF's Entitlement to a Charging Lien**

TCF argues that, before Plaintiffs discharged the firm "due to a breakdown in the attorney-client relationship," TCF had "performed significant substantive work" including drafting a demand letter, interviewing Plaintiffs, obtaining documents, drafting a class action complaint, and negotiating a settlement on behalf of Ms. Melendez and Y.A. (Dkt. No. 84-10 at 7–8). TCF asserts that ECFS "attempted to include" Y.S. as part of the proposed settlement and wanted both Y.A. and Y.S. to leave the school, which "enraged" Ms. Melendez, who then yelled at the TCF attorneys. (Dkt. No. 84-10 at 8). TCF claims that they "remained willing and able to represent" Plaintiffs and assist Y.S. in finding an alternative school, but Ms. Melendez "ceased communicating with TCF." (Dkt. No. 84-10 at 8–9).

In support of their argument that they discharged TCF for cause, Ms. Melendez responds that she never met in person with Sells or the other TCF attorney, Mina Malik, but only communicated by Zoom, text and email, and "short telephone calls[,]" and that Sells did not provide "any guidance whatsoever about the potential value of [their] claims" or "specific information about his global settlement discussions with" ECFS. (Dkt. No. 86-1 ¶¶ 5, 9). Ms. Melendez characterizes Sells' communications with her as "beyond violent" and accuses Sells of subjecting her with "constant yelling, gaslighting, judgement [sic][.]" (Dkt. No. 86-1 at 6). Ms. Melendez asserts that Sells' "abusive conduct" made her feel "unsafe" and was the reason she terminated TCF. (Dkt. No. 86-1 ¶ 11).

We find that Plaintiffs have not demonstrated that TCF committed "a significant breach of a legal duty[]" as is required to conclude that they dismissed TCF for cause. Antonmarchi, 678

F. Supp. 2d at 241. We have reviewed the text messages between Sells and Ms. Melendez, and while the tone certainly deteriorated (Dkt. No. 86-1 at 6), we do not see in any of Sells' messages the kind of abusive language or other misconduct that courts have deemed to indicate discharge of an attorney for cause. See Chen, 2020 WL 10574176, at *7 (collecting cases). In addition, Ms. Melendez admits that she, not Sells, chose to cut off communications with TCF, "not that he abandoned them." Wright I, 2025 WL 2616578, at *13. (See Dkt. No. 86-1 ¶ 11). Although, as in Wright I, "one could envision clearer and more frequent communications between Sells and Plaintiffs," 2025 WL 2615678, at *13, we nevertheless conclude that Plaintiffs have not met their burden to show that TCF "violated any legally or professionally imposed duty" that would support finding that they had dismissed TCF "for cause" thereby depriving TCF of a charging lien altogether. Allstate, 258 F. Supp. 2d at 312.

Accordingly, we deem TCF's dismissal to have been without cause. See Wright I, 2025 WL 2616578, at *13; Mason I, 2025 WL 2336096, at *8.

**b. Amount of the Charging Lien**

Because Plaintiffs did not discharge TCF "for cause," TCF is entitled to a charging lien on a quantum meruit basis. See Wright I, 2025 WL 2616578, at *13; Mason I, 2025 WL 2336096, at *8. TCF requests attorneys' fees of $63,630.00 ("TCF's Requested Fees"). (Dkt. No. 84-10 at 10).

**i. Legal Standard**

Absent an agreement between the parties fixing that amount of a charging lien, the following factors are helpful in assessing the amount of a charging lien on a quantum meruit basis:

> the difficulty of the matter, the nature and extent of the services rendered, the time reasonably expended on those services, the quality of performance by

> counsel, the qualifications of counsel, the amount at issue, and the results obtained[.]

Sequa, 156 F.3d at 148 (citing Spano v. Scott, 166 A.D.2d 917 (4th Dep't 1990)). After "consider[ing] all the factors relevant to a quantum meruit fee analysis," courts appropriately turn to a lodestar analysis to reach a specific dollar figure for the value of the services rendered." Id. We incorporate by reference the discussion of the lodestar calculation, reasonable hourly rate, and hours reasonably expended. (See § III.2.b, supra).

**ii. Application**

Here, the quantum meruit analysis substantially overlaps with the lodestar analysis, so in the interest of efficiency, we streamline our approach to arrive at the recommended amount of the charging lien. See Wright I, 2025 WL 2616578, at *14.

**a) Reasonable Hourly Rate**

Three attorneys at TCF recorded time to Plaintiffs' matter, Sells, Malik, and Tracey L. Brown. (Dkt. Nos. 84-7–84-9; 84-10 at 10-11). TCF acknowledges that the Court previously determined that Sells' reasonable hourly rate was $650 (reduced from his billed hourly rate of $1,250) and Malik's reasonable hourly rate was $500 (reduced from her billed hourly rate of $1,000), and wisely, does not argue for a different rate here. (Dkt. No. 84-10 at 10). See Wright I, 2025 WL 2616578, at *14; Mason I, 2025 WL 2336096, at *10. As to Ms. Brown, TCF's Managing Partner who is a member of the California and New York bars and "is a recognized leader in the field of civil rights and anti-discrimination law," TCF requests an hourly rate of $500. (Dkt. No. 84-10 at 10).

As in Wright I and Mason I, we respectfully recommend $650 as a reasonable hourly rate for Sells, $500 for Malik, and given her comparability to Malik's experience, $500 for Brown.

**b) Hours Reasonably Expended**

Sells recorded 63.5 hours representing Plaintiffs,[13] Malik recorded 40.4 hours, and Brown recorded 3.4 hours. (Dkt. Nos. 84-7–84-9; 84-10 at 10). Plaintiffs align TCF's billing records in this action against those TCF submitted in Mason and Wright and argue that TCF's "blatant—indeed, triple—billing" disqualifies TCF from any entitlement to fees. (Dkt. No. 86 at 7–11). Plaintiffs also argue that TCF's billing records are insufficiently detailed, contain block billing and billing for internal communications, indicate excessive numbers of hours for tasks performed in all three actions, and fail include a reduction for the fees TCF received in Mason and Wright. (Dkt. No. 86 at 11–17). TCF responds that, because it "did not bill these clients," it did not improperly double or triple bill, and, in any event, obtained a settlement, albeit unconsummated, for Ms. Melendez and Y.A. that "was equivalent to almost two thirds of the ultimate result" in the Settlement. (Dkt. No. 91 at 7–8). TCF also notes that it did not bill Plaintiffs for Brown's time and that the time recorded for internal communications "was necessary to collaborate" on the draft complaint. (Dkt. No. 91 at 11).

The Court is not required to "set forth item-by-item findings concerning what may be countless objections to individual billing items." Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994). First, as discussed in Mason I and Wright I, Sells and Malik both routinely recorded time for internal meetings and calls with each other, and also with Brown. (See Dkt. Nos. 84-7 (time entries dated Apr. 7, 2022, Apr. 8, 2022, Apr. 11, 2022, Apr. 14, 2022, May 2, 2022, June 2, 2022, June 29, 2022, July 11, 2022, July 20, 2022, Aug. 1, 2022, Aug. 26, 2022, Aug. 27, 2022,

---

[13] Sells claims to have recorded 64.2 hours (Dkt. No. 84-10 at 10), but based on our review of the billing records, the total is 63.5 hours. (See Dkt. No. 84-7).

Aug. 28, 2022, Aug. 29, 2022, Aug. 30, 2022); 84-8 (time entries dated Apr. 7, 2022, Apr. 8, 2022, Apr. 14, 2022, June 29, 2022, July 2, 2022, July 11, 2022, Aug. 1, 2022, Aug. 25, 2022, Aug. 26, 2022, Aug. 27, 2022, Aug. 28, 2022, Aug. 29, 2022, Aug. 30, 2022). We find it unlikely that TCF "would be able to bill a client for this quantity of internal conferences." Love & Madness, Inc. v. Claire's Holdings, LLC, No. 21 Civ. 1913 (SLC), 2022 WL 5138806, at *11 (S.D.N.Y. Oct. 5, 2022) (collecting cases).

Second, Plaintiffs are also correct that TCF's time records reflect block billing (Dkt. No. 86 at 15–16), i.e., composite entries that do not allocate how much time was spent on individual tasks, although this practice "does not automatically preclude recovery for the hours billed[.]" Benihana, Inc. v. Benihana of Tokyo, LLC, No. 15 Civ. 7428 (PAE), 2017 WL 6551198, at *3 (S.D.N.Y. Dec. 22, 2017). But reductions are appropriate "when (1) there is reason to believe that the hours billed were independently unreasonable; (2) the block billing involved aggregating tasks that were not all compensable; or (3) the number of hours block billed together was so high (such as five hours or more) so as to create an unacceptable risk that the aggregated total exceeded the reasonable hours worked on compensable tasks." Id. The time records here implicate the first and second concerns, given that Sells and Malik appear to be seeking compensation here for the same tasks for which they have already received fees in Mason I and Wright I (see Dkt. Nos. 86-2–86-3), and include "time for tasks such as internal conferences that are not otherwise compensable for the reasons discussed above[,]" thereby impeding our ability to discern how much time is reasonably compensable. Mason I, 2025 WL 2336096, at *10.

We have already concluded, and Judge Oetken has agreed, "that a modest 10% overall reduction of Sells' and Malik's hours is warranted to account for the billing issues we have noted

above." Mason I, 2025 WL 2336096, at *10; see Mason II, 2025 WL 1862829, at *3 (finding that 10% reduction of "TCF's claimed hours was entirely reasonable given the use of block billing and bills reflecting hours of internal meetings"). We do not see these issues in Brown's hours, however, and do not propose any reduction to her hours. (See Dkt. No. 84-9).

Applying the 10% reduction to Sells' and Malik's hours and the recommended hourly rates, we respectfully recommend that TCF be granted a charging lien against the Settlement in the amount of $57,027.50 (the "Charging Lien"), calculated as follows:

| **Timekeeper** | **Requested Rate** | **Awarded Rate** | **Requested Hours** | **Awarded Hours** | **Total** |
|---|---|---|---|---|---|
| Sells | $650 | $650 | 64.2 | 57.15[14] | $37,147.50 |
| Malik | $500 | $500 | 40.4 | 36.36[15] | $18,180.00 |
| Brown | $500 | $500 | 3.4 | 3.4 | $1,700.00 |
| **TOTAL** | | | | | **$57,027.50** |

As with Smith, we respectfully recommend that the difference between TCF's Requested Fees and the Charging Lien – $6,602.50[16] – be allocated to Plaintiffs. See R.G., 2016 WL 3072396, at *3.

## IV. CONCLUSION

For the reasons set forth above, we respectfully recommend that:

(1) Plaintiffs' Motion for an Infant Compromise Order be GRANTED and the Settlement be APPROVED;

[14] 63.5 * 0.9 = 57.15.
[15] 40.4 * 0.9 = 36.36.
[16] $63,630.00 - $57,027.50 = $6,602.50.

(2) Smith be awarded fees of [redacted], and the difference between Smith's Requested Fees and Smith's Awarded Fees, [redacted], be allocated to Plaintiffs in any final order;

(3) TCF's Motion to Enforce a Charging Lien against the Settlement be GRANTED IN PART and DENIED IN PART, to the extent that TCF is granted a Charging Lien against the Settlement in the amount of $57,027.50, and the difference between TCF's Requested Fees and the Charging Lien, $6,602.50, be allocated to Plaintiffs in any final order.

Dated: New York, New York
September 14, 2026

**SARAH L. CAVE**
**United States Magistrate Judge**

* * *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Oetken.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).